FISCHL et al, *Respondents,*
*v.*
AUST, *Appellant.*
(TC 73-1975, SC 24694)
566 P2d 518

Lynn Moore, of Moore, Wurtz & Logan, Springfield, argued the cause and submitted briefs for appellant.

Jerome B. Buckley, Jr., Portland, argued the cause for respondents. With him on the brief were Herbert B. Galton and Galton & Popick, Portland.

Before Holman, Presiding Justice, and Howell, Lent and Tompkins, Justices.

LENT, J.

Holman and Howell, JJ., specially concurring.

**LENT, J.**

This is a suit in equity for an accounting. We review de novo. ORS 19.125(3). The issues before us are whether defendant entered into a binding agreement to contribute to various union trust funds and, if so, whether plaintiffs, who are the trustees of those funds, are barred by laches from enforcing the agreement. The trial court determined both issues in plaintiffs' favor. We affirm.

The dispute had its origins in September of 1970, when defendant Aust, who had been conducting a small sign-painting business in Springfield, was considering working as a painting contractor. To determine what was involved in becoming a union contractor, he met with Robert Davis, the business representative for the Painters Local Union #1277 in Eugene. After talking with Davis, defendant signed two documents, one of which is the agreement at issue in this case. It is a printed form entitled "Subscription Agreement." By its terms defendant agreed to be bound, as an employer, by an existing collective bargaining agreement,[1] and by the provisions of various trust fund agreements.[2] In effect, defendant purported to bind himself, as of September 28, 1970, to make contributions to each of the trust funds at specified rates which depended on the number of hours worked by his employees and their rates of pay. Davis signed the agreement as a representative of the union's District Council.

---

[1] The current Oregon State and Southwest Washington Area Agreement for the painting and drywall industries.

[2] The Subscription Agreement specified the Oregon and Southwest Washington Painters Medical-Hospitalization Trust Fund, the Oregon and Southwest Washington Painters Pension Trust Fund, the Oregon and Southwest Washington Painters Apprenticeship and Training Trust Fund, the Oregon and Southwest Washington Painters Vacation Trust Fund, "and any other trust funds formed pursuant to said area agreement." The plaintiffs include the trustees of the Oregon and Southwest Washington Industry Advancement Trust Fund, which was created in 1973 pursuant to collective bargaining agreement.

[ 183 ]

The second document is also a printed form which is on the same page as, and directly below, the Subscription Agreement. The two forms are separated by a row of perforations. This second document is entitled "Application for Shop Card." It is directed to the Oregon State and Southwest Trade Board.[3] It consists of a request for the issuance of a union shop card and of an agreement to be bound by the terms of the collective bargaining agreement and the trust agreements.

At the time he signed these documents defendant had no employees. He testified that it was his understanding, based upon his discussion with Davis, that the application would not be complete, and there would be no binding agreement, until he had furnished the union or the Trade Board with his various state and federal employer's account numbers. The spaces provided for those numbers were left blank in both forms. Davis denied telling defendant that the subscription agreement would not become operative until the account numbers were supplied.

Shortly after signing the agreement and the shop card application, defendant became ill and, because of his illness, had to give up his immediate plans for operating as a painting contractor. While he was ill, the Trade Board notified him by letter that his shop card application had been approved, subject to the receipt of his account numbers and to his appearance at a Trade Board committee meeting to "discuss the terms of the agreement."

Defendant never appeared at a Trade Board meeting and did not submit any account numbers. He testified that he notified Davis by telephone that he was withdrawing his application, but Davis denied that this conversation took place. Defendant also

---

[3]The Trade Board is a body created by the collective bargaining agreement. Its membership is composed of both union and employer representatives.

testified that, after receiving a second notice to appear at a Trade Board committee meeting, he called the union office in Portland to say that he had withdrawn his application. He was not sure to whom he had spoken, but testified it might have been Mr. Fischl, who was at that time a union business representative. Fischl denied that he had such a conversation with defendant.

The Trade Board committee thereafter sent defendant the following letter, over the signature of Davis as chairman:

"This letter is your notification that Trade Board South Committee has taken the necessary action to suspend your shop card privileges as of December 10, 1970 for failure to appear as requested and to submit account numbers.

"To be reinstated you will be required to appear in person before the Trade Board South Committee, pay all fringes due, pay a $50.00 reinstatement fee and you may be required to post a bond.

"Also, we wish to advise you that as long as you are in the painting business you are subject to the terms of the agreement until its expiration date. If you quit the business you must notify the committee of your decision 60 days prior to quiting [sic] the trade."

The matter rested there for the time being. However, in the summer of 1971 defendant began hiring employees and acting as a contractor on non-union jobs. He did not make any contributions to the trust funds as required by the terms of the collective bargaining agreement.

Early in 1973, in order to be able to work on larger jobs, defendant applied again for a shop card. Shortly thereafter, he was notified that he was delinquent in his trust fund contributions and that shop card privileges were, therefore, unavailable. Defendant denied that he had been obligated to make those contributions. This suit followed.

At trial and on appeal, defendant has contended

that the Subscription Agreement never became effective because he and Davis, representing the union, agreed that it would not be binding until defendant's account numbers had been furnished and a shop card issued. By its terms, the Subscription Agreement was to become effective immediately and was not conditioned upon issuance of a shop card to defendant. The Application for Shop Card, which was signed at the same time, was not to become effective until it was approved. The language of the Application, however, would not lead an applicant to believe that the effectiveness of the Subscription Agreement was similarly postponed. The Application provided:

"The undersigned employer understands that this application is subject to approval and the issuance of a shop card as outlined in said agreement, and payment of all fringe benefits shall be due from the date of this application."

■■ Whether the parties agreed orally to such a condition was an issue that had to be resolved on the basis of the credibility of the witnesses. Defendant testified that his conversation with Davis was to that effect, while Davis denied that such an understanding was discussed. Although we review de novo, where the credibility of witnesses is central to an issue of fact, we give substantial weight to the trial court's findings. *Lichty v. Merzenich,* 278 Or 209, 213, 563 P2d 690 (1977); *Ollman v. Active Homes,* 278 Or 113, 562 P2d 1217 (1977). We accept the finding on this issue of credibility which is implicit in the trial court's general finding of the disputed facts in plaintiffs' favor, and hold that defendant was bound by the Subscription Agreement, which by its terms became effective on September 28, 1970, and was therefore obliged to make the required contributions to the trust funds.

Defendant also contends that plaintiffs were guilty of laches and that enforcement of the agreement should be barred as a consequence. He points out that Davis testified that at some time prior to the middle of 1972 he learned, informally, that defendant had bid on

or was performing some contract jobs. Defendant argues that plaintiffs, therefore, knew that defendant was hiring employees and nevertheless failed to notify him that any contributions were due the trust funds.

■ Davis was not a trustee of any of the funds. Assuming, without deciding, that his knowledge should be attributed to the trustees,[4] we nevertheless agree with the trial court that defendant has not made out a defense of laches.

■ If this were an action at law, the applicable statute of limitations would require that it be commenced within six years of the accrual of the cause of action.[5] This suit was filed in May of 1973, approximately two and one-half years after defendant signed the Subscription Agreement and approximately two years after he began hiring employees. We have held that when a suit in equity is brought within the analogous limitation period, the burden is on the defendant who relies on a defense of laches to show that plaintiff has delayed unreasonably in bringing suit, and that he has been prejudiced by that unreasonable delay. *Hanns v. Hanns,* 246 Or 282, 306, 423 P2d 499 (1967); *McIver v. Norman,* 187 Or 516, 545-46, 205 P2d 137, 213 P2d 144 (1949).

The issues before us on this appeal are not issues which are peculiarly within the jurisdiction of equity. Were it not for the need for an accounting, this case would properly be brought as an action at law.[6] Under these circumstances, we find it particularly appropriate to follow the relevant statute of limitations unless there is a clear showing that to do so would be inequitable.

Defendant has not shown that plaintiffs' delay in

---

[4]This assumption is necessary to defendant's argument. We do not, however, express any opinion on its validity.

[5]See ORS 12.080(1), the general contract statute of limitations.

[6]The accounting has been performed, and no issues concerning that phase of the case have been raised on appeal.

[ 187 ]

enforcing the obligation to contribute to the trust funds was unreasonable under the circumstances of this case. He complains that he was never given notice that any contributions were due. Under the terms of the agreements, however, no such notice was required. It was his responsibility to submit the contributions as they came due.

There is no question but that the timing of this suit is unfortunate for defendant. Not only has his liability for contributions been accumulating but also, before the suit was filed, the date for giving notice that he wished to terminate his contractual obligations had passed.[7] He has not shown, however, that plaintiffs deliberately delayed bringing suit in order to accomplish that result. So far as the record shows, defendant's contractual delinquencies were brought to plaintiffs' attention when defendant reapplied for a shop card and his status as an employer was investigated in that connection. Thereafter, there was no unreasonable delay in informing defendant of his delinquent status. This suit was filed promptly after the intial attempts to collect the delinquencies were unsuccessful.

We agree with the trial court that defendant did not carry his burden of proving laches. It is, therefore, unnecessary for us to consider plaintiffs' contention that federal policy, as embodied in the statutes regulating union trust funds, makes laches unavailable as a defense in a case of this kind.

Affirmed.

---

[7] The collective bargaining agreement which was in force at the time this suit was filed provided:

"Any party to this Agreement desiring to terminate or modify this Agreement shall give the other party sixty (60) days notice prior to the expiration date of this Agreement [May 31, 1973]."

By the terms of the succeeding agreement, notice of termination could not be given again until ninety days prior to June 30, 1976.

**HOLMAN, J.,** specially concurring.

The record in this case does not demonstrate the results which would stem from the failure of the Trade Board to issue a shop card to defendant. The agreement between the parties contemplated that defendant should apply for a shop card. The application and the agreement were signed at the same time, for each was but one part of a single transaction. If, through no voluntary action of his own, defendant failed to receive a shop card and the corresponding right to represent himself as fully complying with union requirements, the agreement would not be binding upon him, since he would not have received the obviously anticipated *quid pro quo* for agreeing to make the payment which plaintiffs seek to recover. However, since the record demonstrates that defendant's failure to receive a shop card was the result of his failure to appear before the Trade Board and to furnish them with requisite information, I concur in the disposition of the case. Defendant should not be permitted, because of his failure to take the action contemplated by the parties at the time the agreement was signed, to avoid his obligation under the agreement.

Howell, J., joins in this specially concurring opinion.