## DAY, *Respondent/Cross-appellant,*
### *v.*
## GRIFFITH, *Appellants/Cross-respondents,*
### and
## KENDALL et al, *Respondents.*
### (No. L-2427, SC 25382)

584 P2d 261

[ 394 ]

Harold Banta, Baker, argued the cause for appellants/cross-respondents Griffith. With him on the briefs were Thomas F. Young, and Banta, Silven & Young, Baker.

W. Eugene Hallman, Pendleton, argued the cause and filed a brief for respondent/cross-appellant Day and respondent Stirewalt. With him on the brief were Robert T. Mautz, and Mautz, Hallman & Rees, Pendleton.

No appearance for respondent Kendall.

Before Denecke, C. J., and Holman, Tongue, Bryson, Lent, and Linde, Justices.

BRYSON, J.

## BRYSON, J.

Plaintiff Timothy Day brought this declaratory judgment proceeding, consisting of six causes of complaint, to determine several disputes with defendant George Griffith. Defendants Edward C. Kendall and James M. Stirewalt are nominal parties defendant whose interests are substantially the same as Day's.[1] Day and Kendall did business together, and Stirewalt purchased some of the animals involved herein. Defendant's answer specifically admitted or denied plaintiff's allegations and affirmatively alleged seven separate defenses and counterclaims.

At the beginning of the trial, after certain admissions, stipulations, and amendments to pleadings, the trial court concluded that the proceeding was one in equity for the accounting of cattle to be delivered or received and for funds due to each other pursuant to agreements between the parties. The defendant filed a trial brief, contending the proceeding was equitable in nature, and plaintiff seems to have conceded such. After reviewing the evidence we agree with the trial court that this proceeding was principally an accounting between the parties and the tracing of assets, animals. We conclude this matter is one in equity, and we review de novo.

The trial court found in favor of plaintiff on some of his causes of complaint and in favor of defendant on some of his counterclaims. After setting off the parties' successful claims against each other, the trial court decreed that defendant have judgment against the plaintiff in the sum of $2,668.03. Both parties appeal. The issues are largely questions of fact.

Kendall and Day were partners in a cattle operation situated at Pilot Rock and Spray, Oregon. The activities included leasing pasture land to other cattle

[1]Day, Kendall and Stirewalt took the same position against defendants George and Lorene Griffith at trial. Day will be referred to as plaintiff and Mr. and Mrs. Griffith will be referred to as defendant or defendant Griffith.

owners. Griffith owned cattle and operated a ranch in Morrow County. This case involves several leasing transactions between Kendall-Day and Griffith, together with ancillary claims and counterclaims, regarding horses and feed items, arising out of their oral and written agreements.

■ The first transaction, the basis of Day's first cause of complaint, was in the spring of 1973. Kendall-Day and Griffith agreed that Griffith would rent pasture from Kendall-Day in Spray, Oregon. This agreement was not reduced to writing and there is a conflict of testimony on its exact terms. Day testified that Griffith agreed to pay $6 per AUM[2] for the right to pasture 150 head of cattle between May 1, 1973, and the end of the pasture season. This sum was to be paid, starting May 1, for a minimum of 150 head so plaintiff could pay "the lease for the range." Kendall corroborated this testimony. Day also produced an expert witness, Mr. Jackson, who testified that such a measurement of pasture rent was an accepted practice in the community. Griffith, on the other hand, testified that the rent was to be paid only for the actual number of cattle pastured and only for the time they were pastured. Day's expert admitted on cross-examination that such an agreement could also be acceptable. Although we review de novo, "we give substantial weight to the trial court's findings where, as in this case, those findings depend on the resolution of conflicting testimony and the credibility of the witnesses." *Krueger v. Ropp,* 282 Or 473, 478-79, 579 P2d 847 (1978); *Fischl v. Aust,* 279 Or 181, 186, 566 P2d 518 (1977). We find, as did the trial court, that the evidence supports Day's version of the contract and is more credible. Accordingly, Day is entitled to recover $6,147.47 on his first cause of complaint,[3] of which Griffith has paid $4,500.

[2] An "AUM" is an "animal unit month." An "animal unit" is a bull or a cow and calf, according to the testimony.

[3] This figure is based on plaintiff's counsel's computations at trial and includes payment for 14 additional heifers that Griffith brought onto the

The net amount due to plaintiff on the oral pasture agreement is $1,647.47.

■ Plaintiff's second cause of complaint was based on a pasture leasing agreement between Griffith, lessee, and Kendall-Day, lessor. Pursuant to this agreement, Griffith kept five cows and their calves and 11 bulls on the Kendall-Day pasture in Pilot Rock, Oregon, between October 4, 1973, and December 1, 1973, at an agreed rent of $6 per AUM. Griffith does not deny this agreement; however, he contends that the trial judge erred in awarding Day $179.60 pursuant to the agreement. Griffith argues that the trial judge improperly counted 21 animal units instead of 16 and that the true amount due to Day is 16/21sts of $179.60, or $136.88. Although the trial judge did find that there were 21 animal units on the pasture, the amount awarded, $179.60, is the correct figure for 16 animal units.[4] Thus, Griffith's objection to this item of damages is not well taken.

Plaintiff recovered $770.80 on his third cause of action, and defendant Griffith does not dispute this amount.

Plaintiff's fourth cause of complaint alleges various credits due from plaintiff to Griffith. These credits amount to $3,050.65. The record shows the parties stipulated to this amount.

Plaintiff's fifth cause of complaint and defendant Griffith's counterclaim thereto is the primary dispute in this proceeding. The parties entered into a contract, captioned "LIVESTOCK SHARE LEASE," dated October 1, 1973, which provided as follows:

---

property in September 1973. Although Griffith disputes the terms of the oral contract, he does not dispute the correctness of plaintiff's calculation if plaintiff's version of the contract is accepted.

[4] Our calculation is $6 per AUM times 16 animal units times 1.87 months, or $179.52. Although this figure is eight cents off the amount prayed for, the difference is minimal. Further, Griffith testified that a slightly larger amount than $179.60 was due.

[ 397 ]

▇▇▇▇▇▇

"For and in consideration of the terms, covenants and conditions hereby exchanged between the parties hereto, the Owner agrees to give to Operators possession of, and Operators agree to accept from Owner, possession of 150 head of Hereford cows and 10 head of Hereford bulls branded ⎯ ⏡ ⎯ on left ribs, subject to the following conditions:

"DUTY OF OPERATORS: Operators shall at their sole and separate expense furnish all the operating expense, including but not limited to, the labor, hay, grass, grain, and prepared feeds, if any, salt, mineral, and any other feed necessary for the proper maintenance of the cattle together with transportation and medical expense thereon, and that, by November 1 of each year of this lease Operators will have on hand sufficient feed and have sufficient pasture arranged for to properly provide for this and all other cattle run by Operators for the following year.

"TITLE AND LOSS: That the title of the said cows and bulls shall remain in Owner and the first three percent (3%) of the proven death loss of cows and bulls, if any, except from negligence of Operators, shall be the sole and separate loss of the Owner. Any other loss, which shall include bulls, cows and One-Third of calves, shall be the sole and separate expense of Operators.

"In the event of any loss Owner is to be notified immediately by phone and by letter within ten (10) days.

"In the event that for any reason a cow or bull must be sold, such animal may be sold by Owner and the proceeds therefrom shall be the sole and separate property of Owner.

"RENTAL: In the spring between the approximate dates of March 15 and June 1 of each year during the term of this lease, weather conditions permitting, the calves shall be branded with the registered brand of Owner, together with the ear mark of a notch in the lower side of the right ear, and between the dates of November 1 and December 1 of each year during the term of this lease, commencing December 1, 1973, weather conditions permitting, the calves will be taken from the cows, and the parties hereto shall divide the increase by sex on the basis of One-Third to Owner and Two-Thirds to Operators as follows:

[ 398 ]

"(a) Owner shall pick one (1) calf and Operators shall pick two (2) calves until the calves are all divided and the party that has the first selection on the steers shall have the second selection on the heifers. In the event that there is any odd number remaining the parties shall divide them as may be agreed upon at that time.

"\* \* \* \* \*.

"(c) Upon receiving their share, Operators shall immediately brand with their own registered brand, the calves they receive as their share unless otherwise agreed at that time.

"(d).It is specifically agreed and understood that title to the calves shall go to the parties hereto in the percentage above stated and, thereafter, the loss of any of said calves shall follow title.

"(e) Operators shall have no duty to range or feed the calves of Owner after they have been divided.

"EXPENSE PAYMENT: It is specifically agreed and understood that Operators shall promptly pay all expenses, including but not limited to labor, hay, grain, and prepared feeds, if any, salt, mineral, and any other feed necessary for the proper maintenance of the cattle together with transportation and medical expense thereon.

"\* \* \* \* \*.

"CARE: Operators shall operate the said cattle in the general area of Pilot Rock, Oregon and Spray, Oregon in good flesh and strong, healthy condition during the entire year, in a good and husbandman like manner consistent with the customs of good cattle ranching in that area, \* \* \*.

"\* \* \* \* \*.

"TERM: This agreement shall commence on December 1, 1973 and continue for three (3) years. In the event that no new agreement is made by October 31, 1976, then Owner shall, on November 30, 1976 be entitled to and receive the return of 150 cows and 10 bulls at place of original delivery, or sufficient compensation for any cows or bulls for any less than those numbers and One-Third of any calves lost as determined by an average weight of the calves. Any loss must be compensated for at the time the calves are divided before

[ 399 ]

title on any calves passes to Operators at the end of each year.

"\* \* \* \* \*."

Pursuant to this lease, Griffith delivered 150 cows and, ultimately, 12 bulls to the Kendall-Day pasture near Pilot Rock.

Plaintiff's fifth cause of complaint does not request damages, but, rather, asks for a declaration that Kendall-Day fully performed its part of the bargain. Defendant Griffith counterclaims for lost cattle, for deterioration of other cattle, and for plaintiff's failure to provide Griffith with his share of the calf crop. Griffith also sought to set aside the sale of certain calves to a third party, defendant James Stirewalt.

The results of the livestock sharing agreement turned out to be unsuccessful. The range that year was poor. In addition, the Griffith cattle would not "range" properly; that is, they would not wander through the higher land where the bunch grass was, but would, instead, stay by the stream beds where there was less food.

The calf crop was 135, of which Griffith's share was 45. When it came time to divide the calf crop pursuant to the contract, Kendall called Griffith to arrange for the division but Griffith was busy with seeding and he "couldn't come over."[5] The livestock share lease provided that the calves would be divided by December 1, 1974. Because the parties could not get together to agree on a division, the calf crop was still not divided on December 16. Kendall-Day were running out of cash and had to sell the calves because they could not afford to feed them. They therefore sold 78 of the calves to Stirewalt on December 16, reserving enough calves to allow Griffith to get his share, 45, from the Kendall-Day pasture. Kendall testified:

_____

[5]This finding by the trial court is disputed by Griffith; however, as in other cases where the evidence conflicts, we accept the trial court's findings.

[ 400 ]

"Q   Now, getting back to November, what was Mr. Griffith's response when you told him that the cattle were gathered?

"A   Well, he was seeding right then and he couldn't come over.

"Q   And did you talk to him on other occasions during November, again?

"A   Yes, I think two or three times * * *.

"* * * * * *.

"Q   * * * Did Mr. Griffith call you about this sale?

"A   To the best of my knowledge I think he did.

"Q   * * * And what did he tell you?

"A   He told me that he didn't like the sale, and that we should do something about it.

"Q   And did you in fact do something about it?

"A   Yes, I did. I went down and talked to Jim Stirewalt and that was—I think that was just a day or two after the sale.

"Q   And what did you tell Mr. Stirewalt; I mean, did you ask Mr. Stirewalt to hold the calves?

"A   Yes, yes, I did.

"Q   Did you ever tell Mr. Griffith that Mr. Stirewalt was holding these calves?

"A   Yes, I did * * *.

"* * * * * *.

"A   I called George [Griffith] back. I don't know what day that was and I told him that—that Mr. Stirewalt was holding the cows."

Kendall further testified that he called Griffith back November 15, 1974, and advised that all the cows were ready to be counted for the division, except for the dead ones. Griffith eventually got 32 of his 45 calves, which he left on the Kendall-Day pasture until sometime between April and September of 1975.

■   The trial court found that during the lease term, in addition to the 13 calves that Griffith did not receive, two bulls and six cows died or were missing. Our review of the evidence, which is conflicting, persuades us that these figures are correct. The trial court also found, and we agree, that the value of the calves was

[ 401 ]

$965.25; the bulls, $1,000; and the cows, $1,500.[6] Under the lease, Kendall-Day was entitled to a credit for the first 3 percent of proven deaths for bulls and cows, which leaves a net sum due Griffith of $2,215.25. Plaintiff Day argues that the trial court improperly awarded damages for the 13 missing calves. We do not agree. Plaintiff acknowledged at trial that it was his responsibility to account for 150 cows, 12 bulls and 45 calves.

■ The trial court further found that Kendall-Day had performed their part of the bargain and that the parties agreed to terminate the contract on December 17, 1974. Defendant Griffith contests this latter finding, contending that the agreement did not terminate on December 17, but should have continued until all the cattle were gathered and returned to him and the calf crop was divided.

The trial court's finding that the contract was terminated was based on a stipulation by counsel. Plaintiff alleged that the contract was terminated on December 15, 1974.[7] The following dialogue occurred at trial:

"THE COURT: Well, as I read the pleadings, there was a date—and I don't recall what the date was. —In which, was it, Mr. Day, called and said he considered the contract at an end? And I find in the pleadings at least no issue but what the contract was terminated as of that date. Am I right in that?

"[DEFENSE COUNSEL]: That's correct, Your Honor."

We conclude that the contract was terminated as of December 17, 1974.

---

[6]The parties agreed that the bulls were worth $500 each. Their estimate of the value of the cows averaged out to $250 each. Stirewalt paid an average of 25 cents per pound for the calves, and the calves averaged 297 pounds each so the court awarded $74.25 per calf. The price Stirewalt paid is not disputed.

[7]At trial it appeared that the true date of termination was December 17, 1974, when Day telephoned Griffith and told him some calves had been sold to James Stirewalt. This two-day variance is not significant.

■■ Griffith also objects to the trial court's disposition of the damages issue for the missing calves. Griffith's chief argument is that damages were not a sufficient remedy and that he was entitled to the return of the calves themselves. Whatever the merits of Griffith's contention might be in a law action, this was an equitable proceeding. An equity court has substantial powers to fashion appropriate remedies. *Stan Wiley v. Berg,* 282 Or 9, 21, 23-24, 578 P2d 384 (1978). Under the facts of this case, enforcing the remedy Griffith prayed for would have been difficult, if not impossible, because Stirewalt had sold some of the calves in question and did not know how many he retained. Further, the calves had become yearlings by the time this lawsuit was filed, and it would not be equitable to give Griffith the value of the growth of the calves in the interim. Finally, it is undisputed that Griffith had an opportunity to go to Stirewalt's ranch and pick his calves because Stirewalt kept the calves segregated for that purpose for several months. However, Griffith failed to pick his calves or make the division. In light of all the circumstances, we agree with the trial court that the remedy of damages was appropriate. No one knew where the calves were at the time of trial.

■ Griffith also contends that even if he is only entitled to damages, he is at least entitled to damages for 18 missing calves, not 13. His reasoning is that the term "calf crop" in the livestock share lease means *possible* calf crop, not *actual* calf crop, and that the possible calf crop was 150, there being 150 cows. One-third of 150 is 50, and, because Griffith received only 32 calves, he is entitled to compensation for the missing 18. We find this a strained reading of the lease and agree with the trial court's determination that the lease referred to the actual calf crop. Thus, Griffith's share would have been one-third of the actual crop of 135, or 45 calves. Plaintiff conceded liability to account for 45 calves. The amount of damages per calf determined by the trial court, $74.25, as previously

discussed, is fully justified by the evidence. Accordingly, we reach the same conclusion as did the trial court on the issue of damages for missing calves.

■ Griffith's final contention is that he was entitled to recover $20,000 for the deteriorated condition of his herd on termination of the livestock share lease. The cattle were in poor condition at that time, although the calves were "good quality" according to Stirewalt. However, we find from the evidence, as did the trial court, that Day and Kendall did not breach their duties under the contract. It is true that they had a duty to furnish "feed necessary for the proper maintenance of the cattle * * *" and to keep the herd "in good flesh and strong, healthy condition during the entire year, in good and husbandman like manner consistent with the customs of good cattle ranching in that area * * *." It does not appear, however, that Day and Kendall would be guarantors of the condition of the cattle under all pasture conditions. The evidence is that the pasture was poor in 1974. Further, the Griffith cattle would not range properly. Day and Kendall tried to drive the cattle up on the higher land for better feed, but the cattle, particularly the older cows, would return to the stream bottoms where the pasture was of poorer quality. Phil Wilson, plaintiff's expert, testified that Day and Kendall did all that could be expected to get the cattle to range and that no operator could have made the cattle come out better than they did. Indeed, Griffith himself told Kendall that he had done as good a job as could be expected. Because the livestock share lease itself specifies that Kendall and Day were to operate the herd "in good and husbandman like manner consistent with the customs of good cattle ranching in that area" and because we are persuaded that they did so operate the herd, given the characteristics of the range and the cattle, we conclude that Kendall and Day did not breach the agreement and that Griffith is not entitled to recover on this counterclaim.

[ 404 ]

■ Plaintiff Day cross-appeals, contending "[t]he Court erred in holding that Plaintiff and Defendant Kendall were indebted to Defendants Griffith in the amount of $965.25 for thirteen missing calves," and that "[t]he Court erred in ruling that there was no evidence of reasonable value of pasturage provided 32 Griffith calves remaining after the termination of the Contract." Both of these assignments raise a question of fact based on the evidence adduced.

Plaintiff argues that he should not have to pay Griffith for the 13 missing calves but, as previously discussed, his attorney conceded at trial that it was Day's duty to account for the calves. Day also contends that he was entitled to recover for pasturage provided by the Kendall-Day partnership for Griffith's 32 calves after December 17, 1974, when the livestock share lease expired, until they were gathered and removed by Griffith in 1975. The trial judge denied this claim, saying that Day had presented no evidence to justify recovery.[8]

We agree that there is no evidence of any express pasturage agreement; however, in the absence of an express agreement, plaintiff was entitled to recover the reasonable value of the pasturage, and, despite the trial court's finding that there was no evidence of reasonable value, we find there is competent evidence. Plaintiff Day testified that $10 per AUM was the reasonable value thereafter and that the sum due is $1,428.15. We note that plaintiff's calculation treats the pasturage period as beginning on December 1, 1974, whereas it could not have begun until after December 17, 1974, when the livestock share lease was terminated. We therefore conclude the pasturage sum due is $1,428.15, less 1/30 months × $10/AUM × 32 animal units or $181.33, leaving $1,246.82 due plaintiff on this cause of complaint.

---

[8]The trial judge commented that it was difficult to recap all of the evidence of this complicated record without a transcript and we agree.

To summarize, we find that plaintiff is entitled to recover $1,647.47 on his first cause of complaint, $179.60 on his second cause of complaint, $770.80 on his third cause of complaint, and $1,246.82 on his sixth cause of complaint, for a total of $3,844.69. Defendant Griffith is entitled to recover various credits amounting to $3,050.65 and $2,215.25 for dead or missing cattle, for a total of $5,265.90, leaving a net sum due Griffith of $1,421.21. The decree is modified to provide for plaintiff's recovery on his sixth cause of complaint and is affirmed in all other respects.

Affirmed as modified. Costs to neither party.