Argued in Pendleton, October 30, 1978, affirmed
as modified February 7, 1979

McDONALD et ux, *Respondents,*
*v.*
SHORE et ux, *Appellants.*
(No. 6212, SC 25624)

SHORE et ux, *Appellants,*
*v.*
McDONALD et ux, *Respondents.*
(No. 6304, SC 25624)

590 P2d 218

J. C. Van Voorhees, of Bodie, Minturn, Van Voorhees, Larson & Dixon, Prineville, argued the cause and filed briefs for appellants.

Francis I. Smith, of Smith & Smith, Portland, argued the cause for respondents. With him on the brief were Darrell E. Bewley, Portland, and James G. Kincaid, Redmond.

Before Denecke, C. J., and Holman, Tongue, Howell, Bryson and Lent, Justices.

BRYSON, J.

**BRYSON, J.**

These equity cases were consolidated for trial and on appeal. Plaintiffs,[1] purchasers, brought this suit to rescind their contract with defendants for the purchase of a grocery store and related real property from defendants, the Shores, and for restitution of most of the money they had paid to defendants on the ground of defendants' fraudulent misrepresentation, which plaintiffs relied on. Defendants sought foreclosure of the sales contract with plaintiffs for plaintiffs' failure to make the monthly payments required by the contract.

The trial court's final decree ordered rescission of the contract and restitution to plaintiffs of their $20,000 down payment, $2,000 in monthly payments, and $450 for a sewer line connection fee that plaintiffs paid. The court decreed an offset of sums reflecting the reduced inventory value and reasonable rental value of the premises and granted plaintiffs a net judgment of $16,011.45. The trial court also decreed dismissal of defendants' foreclosure suit. Defendants appeal from both decrees.

We review de novo but defer to the trial court's findings where such findings depend on the credibility of witnesses. *Day v. Griffith,* 283 Or 393, 396, 584 P2d 261 (1978); *Krueger v. Ropp,* 282 Or 473, 478-79, 579 P2d 847 (1978); *Fischl v. Aust,* 279 Or 181, 186, 566 P2d 518 (1977).

The trial court gave a letter opinion and on December 1, 1977, entered findings, in part, as follows:

"1. On or about June 1, 1976 Defendants contracted to sell and Plaintiffs contracted to buy the real and personal property known as Johnnie's Market in Culver, Oregon, the real property being legally described as:

---

[1] Although the McDonalds were plaintiffs in one suit and defendants in the other, we refer to McDonalds as plaintiffs and to Shores as defendants.

"Lots 3 and 4 and the north 12 feet of Lot 5, Block 32, according to the official plat of the City of Culver, on record and on file in the office of the Jefferson County Clerk.

"2. That Plaintiffs paid down the sum of $20,000 and thereafter made payments of $400 per month for the months of July, August, September, October, and November, 1976.

"3. On October 14, 1976 Plaintiffs, through their counsel, notified Defendants of Plaintiffs' rescission of the said contract based upon fraudulent misrepresentations of Defendants inducing the sale.

"4. Defendants refused to acknowledge the rescission of Plaintiffs and Plaintiffs' offers to then make such equitable adjustments as would as nearly as possible place the parties in their respective positions immediately prior to the consummation of the sale.

"5. Plaintiffs remained in possession of the property and continued the operation of the business to protect the interest of both Plaintiffs and Defendants in the market operation; that Plaintiffs expended the income from the market in addition to $3,500 of their own funds, and were forced to close the doors of the market in early August, 1977. Plaintiffs continued to reside in the living quarters in order to protect the property from vandalism, burglary, or damage pending the trial, and at the time of trial consented to vacate the premises by 5:00 P.M. on September 5, 1977.

"6. Defendants fraudulently misrepresented to Plaintiffs that the premises were connected to the City of Culver sewer system when in fact there was no such connection.

"7. Defendants fraudulently misrepresented to Plaintiffs that the inventory of merchandise then on had at the time of the contract of sale was in a clean and marketable condition when in fact the inventory contained spoiled and outdated merchandise requiring Plaintiffs, to their substantial detriment, to remove such merchandise from the shelves.

"8. That Defendants falsely misrepresented to Plaintiffs that the market had an annual gross [sic, net] profit of $16,000 when in fact the earnings of the business were under $5,000.

[154]

"9. That the foregoing fraudulent misrepresentations were material, particularly in view of the nature of the business, and the said misrepresentations were made by Defendants with the intent that Plaintiffs should rely thereon; that Plaintiffs did so rely upon said misrepresentations.

"10. That Plaintiffs by remaining in the property after Defendants' refusal to acknowledge rescission by Plaintiffs and caring for the premises pending the trial of the matter did not waive their right to rescind the contract.

"11. That Defendants are entitled to certain offsets to effect a restoration to Defendants of benefits received by Plaintiffs under the contract in order to substantially effect a return of the parties circumstances to those existing prior to the sale."

We have reviewed all of the evidence but, as in most rescission cases, there is a conflict of testimony. The following is a brief summary of relevant events. On August 5, 1975, defendants executed an agent's employment contract with Timberline & Taylor Realty for the sale of the property and store. Mr. Cecil Standiford was the salesman handling the transaction and the one who took the written listing signed by the defendants. The listing, subsequently shown to the plaintiffs, showed that the store did $80,000 gross sales with net annual profits of $16,000. Plaintiffs, of Clarkston, Washington, came to the store to inspect it in November, 1975. This inspection lasted 20 to 30 minutes, and nothing materialized at that time. Plaintiffs visited the store on two other occasions, one of which was in the company of the salesman, Standiford, before executing the purchase-sale contract on June 1, 1976. Plaintiff Mr. McDonald testified that the salesman, Standiford, showed him the written listing with the amount of gross sales and net profits and that he relied on these representations.

Mr. Standiford testified as follows:

"THE COURT: Mr. Standiford, the information concerning the gross volume and net profit, etc.,

[155]

was that given to you in response to specific questions you asked of him concerning that or was this volunteered by Mr. Shore without your questioning him?

"THE WITNESS: I'm sure it was volunteered by Mr. Shores to give me this information. I don't recall—well, in the course of conversation, naturally, we was [sic] talking about what the business was doing, and this information was given to me at that time.

"Q [Plaintiffs' counsel]: Now, does—are there any signatures that appear on that form?

"A Yes.

"Q And whose signatures appear there, please?

"A Mr. Shores and Mrs. Shores.

"Q Was that signed in your presence?

"A Yes, sir.

"Q Did they have opportunity to inspect and examine that form prior to placing their signatures on the form?

"A Yes, they did.

"Q Was a copy of that form given to Mr. and Mrs. Shore?

"A They had a carbon copy, yes, sir."

The defendants' tax return for the year 1975, which was received in evidence, shows "gross receipts or sales" of $81,462 and a net profit of $3,675 after deducting interest on business indebtedness of $578. The evidence further shows that on the two occasions plaintiffs visited the store and talked to the defendants prior to purchase, they asked to see and inspect the defendants' books and records and the defendants told them that the records were not there, that they were in the hands of their accountant; the records were never produced for the plaintiffs' inspection.

On June 26, 1976, the defendants gave plaintiffs a notice from the city of Culver advising them that they would have "to hook up" to the sewer. This was the first knowledge plaintiffs had of the defective cesspool and that the sewer hookup was not taken care of by defendants. Also, customers began returning spoiled

canned merchandise, and the plaintiffs found that the income from the store was not what defendants represented it would be. On October 14, 1976, plaintiffs, through their attorney, wrote to defendants rescinding the contract and demanded the return of plaintiffs' down payment. They also offered to meet with the defendants and do whatever was necessary to restore the parties to an equitable position, based on the date of closing the contract.

■ Defendants contend that the plaintiffs waived their right to rescind by delay and by acts inconsistent with an intent to rescind. However, as we recently held in *Bodenhamer v. Patterson,* 278 Or 367, 375-76, 563 P2d 1212 (1977), delay alone does not necessarily constitute a waiver. In the case at bar, plaintiffs did not attempt to sell the business, as in *Edwards v. Wilcoxen,* 278 Or 91, 562 P2d 1207 (1977), fail to make payments prior to notice to rescind, or retain the fruits of the contract awaiting further developments.

■ ■ Plaintiffs gave the notice to rescind within four and one-half months after executing the contract and within a reasonable time after discovering the misrepresentations. We do not consider this to be an unreasonable time, under the facts of the case, in which to have discovered the problems with the sewer connection, the bad merchandise, and the misrepresentation of profit. Further, plaintiffs' other conduct was not inconsistent with an intention to promptly rescind the contract. Defendants' arguments to the contrary are based on plaintiffs' conduct in staying on at the store and continuing to operate it after defendants rejected plaintiffs' offer to rescind. However, the rule is that once defendants rejected plaintiffs' offer to rescind, the plaintiffs may, but need not, abandon the property. *Schuler et ux v. Humphrey et ux,* 198 Or 458, 494-95, 257 P2d 865 (1953); *Widmer et ux v. Leffelman,* 196 Or 401, 407, 249 P2d 476 (1952); *Widmer et ux v. Leffelman,* 187 Or 476, 494-96, 212 P2d 737 (1949). They may, as they did here, continue to operate the property as caretakers for the defendants. Such

incidental benefits to plaintiffs as the rental value of the property are 'matter[s] merely addressed to the court in adjusting the rights of the parties * * *.' " *Jeffreys v. Weekly,* 81 Or 140, 150, 158 P 522 (1916). Defendants cite several cases, arguing that they are to the contrary. *Hay v. Pacific Tastee Freez, Inc.,* 276 Or 569, 555 P2d 1256 (1976); *Ross v. Carlyle et ux,* 216 Or 576, 339 P2d 1114 (1959); *Brown et ux v. Hassenstab et ux,* 212 Or 246, 319 P2d 929 (1957); *Scott v. Walton,* 32 Or 460, 52 P 180 (1898). However, the cited cases really only stand for the rule stated under the facts of these cases. As stated in *Schuler et ux v. Humphrey et ux, supra* at 480, "[e]ach case must be determined upon its own peculiar facts and circumstances * * *."

We conclude, as did the trial court, that plaintiffs did not waive their right to rescind.

■ Defendants next argue that there were no grounds for rescission in that the evidence did not support findings of fraudulent misrepresentations. As stated above, we find, as did the trial court, that there were such misrepresentations. There was also testimony which shows that plaintiffs would not have entered into the transaction but for the misrepresentations.

We therefore conclude that plaintiffs were entitled to rescission. This conclusion disposes of defendants' contention that they were entitled to a decree of foreclosure.

■ Defendants' final contention is that they are entitled to a greater offset for reduction in inventory value than the trial court gave them. Defendants concede that plaintiffs should not be charged for discarding spoiled and outdated merchandise. We agree with defendants that the proper method of computing the reduction in inventory value is to subtract the final retail value of the inventory, $10,599.95, from the initial retail value, $16,790.08. This leaves a difference of $6,190.13. From this, the value of the spoiled merchandise, which the evidence shows to be $902.61, should be subtracted. This leaves

$5,287.52 which must be reduced to wholesale value. Defendants assert that the wholesale figure is 80 percent of the retail figure, and plaintiffs do not disagree. Eighty percent of $5,287.52 is $4,230.02, or $416.47 more than the trial court's figure of $3,813.55. The offset should be increased accordingly. In all other respects, the trial court's decree is affirmed.

Affirmed as modified.