Argued and submitted October 17, affirmed December 29, 1980,
reconsideration denied February 4,
petition for review denied February 24, 1981 (290 Or 519)

HAMPTON et ux,
*Respondents,*
*v.*
SABIN et al,
*Appellants,*
*and*
HOLMES et ux,
*Intervenors-Respondents.*

KITCHEN KETTLE WEST, INC.,
*Appellant,*
*v.*
HAMPTON et ux,
*Respondents.*

KITCHEN KETTLE WEST, INC.,
*Appellant,*
*v.*
HAMPTON et ux,
*Respondents.*

(No. A7901-00202, No. A7811-19077,
No. A7812-19385, CA 15817)

621 P2d 1202

James H. Clarke, Portland, argued the cause for appellants. On the briefs were O'Connell, Goyak, Hagen, Elliott & Krage, Kevin O'Connell, Peter Glade, Spears, Lubersky, Campbell & Bledsoe, and Frank M. Parisi, Portland.

Nick A. Drakulich, Portland, argued the cause for respondents, Gar Hampton and Mary Beth Hampton. With him on the brief was Drakulich & Carlson, Portland.

Dean M. Richards, Portland, filed the brief for intervenors-respondents, Thomas A. Holmes and Willa B. Holmes.

Before Gillette, Presiding Judge, and Richardson and Campbell, Judges.

GILLETTE, P. J.

## GILLETTE, P. J.

These three cases arise out of the sale of a Portland restaurant known as "14 Grains." The plaintiffs herein, the Hamptons, are the buyers of the restaurant located in a building in downtown Portland. The defendant Kitchen Kettle is the corporate seller of the restaurant. The Meatery is the sublessor of the premises on which the restaurant is located, and the Beef & Brew Franchise Company is an umbrella corporation overseeing the operations and expenses of the other two. Defendant Sabin is the major stockholder, president and chief executive officer of all three corporations. Defendant Dwyer is the director of operations for Beef & Brew, and acted as an agent for all three corporations. Intervenors Holmes are the assignees of the Meatery's sublessor's interest in the restaurant premises.

Initially, Kitchen Kettle brought an action against the Hamptons for unpaid installments due on a promissory note given for the balance of the restaurant's purchase price. The Hamptons answered, alleging lack of consideration and fraud on the seller's part. Kitchen Kettle then sued the Hamptons for breach of contract. The Hamptons counterclaimed, requesting rescission of the contract on the basis of misrepresentation and intentional fraud. Finally, the Hamptons brought an action against the defendants herein seeking rescission of the sale and lease agreement. The Holmes intervened in that suit. The cases were consolidated for trial, with the issue of rescission being tried first. The trial court granted rescission to the Hamptons and ordered the defendant corporations to repay certain amounts to the Hamptons. Kitchen Kettle was denied relief in its actions against the Hamptons. The Hamptons were ordered to pay the Holmes the moneys due for unpaid rent and utilities.[1] On *de novo* review, we affirm the decision of the trial court.

---

[1] The trial court's order provides that:

"1. The Sales Agreement, the Promissory Note and the Sublease between the Hamptons and Defendants are cancelled.

In their complaint the Hamptons set out some 28 misrepresentations which they allege were made by the defendants during the course of negotiations for the sale of the restaurant. The trial judge's oral opinion, which became a part of the final order, discusses those claims which he believed were significant. He found that alleged misrepresentations that the restaurant normally did $50,000 in gross business receipts per month, and that Sabin and his

"2. The Hamptons shall have judgment against Kitchen Kettle West, Inc., and Beef and Brew Franchise Company, Inc. fka B & B Management Company, Inc. individually and collectively for $108,000.00, together with interest at the legal rate from November 1, 1978 until paid. This represents:

"a) $100.000 paid as a down payments;

"b) $8,000.00 paid as monthly installments on the Note;

"3. The Hamptons shall have judgment against Meatery Company, aka Meatery, Inc. for $2,814.00, paid as a rental security deposit; however, this money should be applied toward the rental payments which the Hamptons owe to the Intervenors, the Holmes, for the months of November and part of December.

"4. The Hamptons shall be required to pay those business debts, totalling approximately $20,531.66, incurred by the restaurant from November 1, 1978, until December 11, 1978.

"5. The Hamptons shall be required to pay the Intervenors, the Holmes, the sum of $5,193.37. This represents:

"a) $3,322.32 - lease payments for November, 1978 and a portion of December, 1978, from December 1st to December 11, 1978;

"b) $1,665.04 - utility charges for that same period of time, excluding any surcharge thereon;

"c) $199.30 - cost of re-keying the premises.

"6. The Hamptons shall have judgment against Kitchen Kettle West, Inc., Meatery Company aka Meatery, Inc. and Beef and Brew Franchise Company, Inc. fka B & B Management Company, Inc. individually and collectively for their costs and disbursements incurred herein, taxed at $348.60.

"7. The Defendants shall take nothing from the Hamptons in their action on the Promissory Note, Case No. A7811-19077, and in their action on the Contract, Case No. A7812-19385.

"8. The Intervenors, the Holmes, shall have judgment against George Eugene Sabin, II, individually, and Meatery Company aka Meatery, Inc. for $1,985.90. This represents:

"a) $1,850.00 - attorney's fees;

"b) $135.90 - costs and disbursements incurred herein."

corporations had invested over $300,000 in the restaurant were, in fact, true. He also concluded that the days of operation of the restaurant had not been misrepresented to the plaintiffs. He found, however, that the defendants *did* misrepresent the restaurant's past profitability and that the plaintiffs reasonably relied on the defendants' representations in making their decision to purchase the restaurant. On that basis, rescission was granted.[2]

On appeal, the defendants contend that the financial condition of the restaurant was not misrepresented to the plaintiffs, that the allegedly misleading information as to past profitability could not have been material to the Hamptons' decision to purchase the business, and that they could not have reasonably relied on the information provided and the statements made.[3] Additionally, they argue that, even if such misrepresentations were made, plaintiffs are barred from rescinding the contract because of their delay in seeking relief. Plaintiffs meet the defendants' arguments, but do not advance any of the other claimed misrepresentations as a separate basis for our granting them relief. Thus, we will confine our *de novo* review of the evidence to the issues specifically presented to us by the defendants.

On June 9, 1978, one of the plaintiffs, Mr. Hampton, contacted Dwyer, as the agent for the defendant corporations, in response to a newspaper advertisement concerning the sale of "14 Grains." The advertisement stated that a prime downtown lunch and dinner restaurant was for sale, that the restaurant was doing $50,000 per month in gross

---

[2] The trial judge also found that a representation that the plaintiffs' offer was the lowest of three offers to purchase the restaurant was not true, but expressed doubt as to whether that misrepresentation alone would be sufficient grounds for rescission. Defendant's maintain that there was no evidence of misrepresentations with respect to other offers to purchase the restaurant which would support a decree of rescission. Since we do not affirm the rescission on this ground, we need not consider this question.

[3] In their brief on appeal, defendants discuss the alleged misrepresentation concerning future profitability of the restaurant. This was an issue at trial, the plaintiffs contending that defendants repeatedly told them that the business was increasing. However, this claim was not a basis for the trial court's order and therefore is not a central issue on appeal. We are principally concerned with evidence relating to the past profitability of the restaurant.

sales based on the month of April and that over $300,000 had been invested in the restaurant. The Hamptons and Dwyer met to discuss the restaurant and the conditions of its sale on four separate occasions. On June 12, an earnest money agreement and offer to purchase the restaurant for $270,000 was signed by the plaintiffs. The plaintiffs retained the option to rescind their offer if they so desired. On June 14, the parties met in Sabin's office and he approved the offer to purchase. On June 19, the final sales agreement and lease were signed by the parties. The plaintiffs agreed to pay $270,000 for the restaurant and an additional $10,000 for the inventory. They put $100,000 down on the purchase price and signed a promissory note providing for monthly payments of the remainder. The plaintiffs also entered into an agreement whereby they agreed to lease, for ten years, the premises within which the restaurant was located. Rent was set at five percent of the restaurant's gross sales receipts, or a monthly minimum of $2,400.

During the course of the negotiations the plaintiffs were shown a pro forma financial statement for the month of April. That statement was not the actual April statement, but one especially prepared for presentation to the prospective buyers. It detailed the restaurant's sales and expenses, revealing gross sales of $54,990 and a net profit of $1,608. However, certain expenses were omitted and others were reduced. Defendants' accountant testified that the pro forma statement was prepared as an indication of future operations and with the belief that the new owners would run the restaurant as owner-operators; thus, certain corporate expenses were deleted or reduced. The statement contained a footnote which states that it does not reflect manager's salary, extraordinary repair and maintenance costs and supplies for the month, financing interest and corporate administrative cost.

The plaintiffs testified that the pro forma statement was explained to them. Mr. Hampton did not recall seeing the footnote, and claims that it was not explained. However, he did know that certain corporate expenses were excluded. He claimed that Dwyer told him that the pro forma statement was representative of the past history of the business and that the restaurant had been making a profit. He admitted that no one else told him a profit was

being made. The Hamptons claim that they were not shown actual monthly profit and loss statements. They claim that they requested to see such statements a number of times and were told that they would be produced, but they never were. Mr. Hampton stated that he did not finally insist on seeing the monthly statements because he relied on the pro forma statement and Dwyer's assurances. Plaintiffs' attorney, who was present at the closing, did not recall asking for any profit and loss statement or seeing any information pertaining to the restaurant's losses. He testified that the Hamptons thought the business was profitable.

Dwyer and Sabin both testified that the plaintiffs were shown the monthly profit and loss statements and certain daily recaps and that the pro forma statement was compared with the actual one for April. The defendants' accountant testified that a packet of information containing the monthly profit and loss statements was prepared for the Hamptons and given by him to Dwyer. Dwyer also testified that he supplied the Hamptons with the profit and loss statements after the purchase was completed. The restaurant's managers, however, testified that all the financial information concerning the past year of operation, including theirs (the manager's) copies of the profit and loss statements, were removed from the restaurant's office when the transfer of ownership occurred. It is undisputed that the monthly statements reveal a loss for each month of the restaurant's operation since it began business in September, 1977.

■ As this is a suit in equity, we try the case *de novo.* We are not bound by the findings of the trial judge, but must make an independent review of the record. *Myers v. MHI Investments, Inc.,* 44 Or App 467, 471, 606 P2d 652 (1980), *rev den* 289 Or 107 (1980). However, because of the opportunity to see and hear the witnesses as they testify, considerable weight must necessarily be accorded to the trial court's findings where the testimony, or the inferences to be drawn from it, are in dispute. *Dan Bunn, Inc. v. Brown,* 285 Or 131, 145, 590 P2d 209 (1979); *Weathers v. ICOA Ins. Co.,* 254 Or 361, 364, 460 P2d 361 (1969). In this case, the trial court found that, despite the defendants' claims to the contrary, the plaintiffs were not shown the profit and loss statements for each month of the

restaurant's operation. He also found that, in addition to the pro forma statement, oral representations as to the restaurant's profitability had been made and that, given the kind of person Dwyer seemed to be, the plaintiffs were justified in relying upon his representations. The trial judge did, however, indicate that he found it remarkable that the plaintiffs would invest the sum of money they did without insisting on seeing the profit and loss statements.[4]

---

[4] The trial court's opinion provides:

"The term that I think is most critical in this case is the item 2, the alleged misrepresentation about the profitability of the business. As I mentioned, I would not accept that the Hamptons are neophytes of the business world who just came into the big city and got fleeced. I think they're more knowledgeable than that. When the case first started and evidence started to unfold, I was—I could not believe that people would come into Portland, Oregon, ready to invest $270,000 in a restaurant without insisting on seeing all of the financial records of the corporation. And when they said that they didn't see them, they went ahead and made the investment without seeing the P & L's and other financial records[,] I found it almost impossible to believe.

"On the other hand, it's incredible to me that a person with the skill and knowledge of Mr. Hampton and, perhaps, Mrs. Hampton, would invest $270,000 in the corporation, a restaurant, which was not profitable and which, in fact, lost a substantial sum of money in the prior months of its operation.

"So looking at it from their point of view, I did logically arrive at two different conclusions. I know that Mr. Dwyer, Mr. Sabin insist that they delivered the profit and loss statements and the other financial records—at least the profit and loss statements—to these people.

"I have come away considering the totality of all the evidence concluding that that was not true, that the Hamptons did not, in fact—stupid as it may be—did not, in fact, insist upon seeing and seeing the financial profit and loss records of that corporation for the earlier months of operation. I think the only one that they did see was the pro forma statement which did, in fact, reflect a profit. I understand that there are caveats on it, and perhaps the caveats should have given them a hint that the property was not as profitable as it would appear, but then it did, nevertheless, reflect on the pro forma there would be a profit.

"They said they relied on, in addition to the pro forma, the oral representations that, in fact, the restaurant was profitable. As I say, as incredibly dumb as that may be, I think that I conclude that that is the best evidence and I would find that there was a misrepresentation as to the profitability of the restaurant.                      .

"The next question is whether or not they had a right to rely on it. They did see a pro forma. They were talking to Mr. Dwyer—and I don't mean this in a critical way—I think Mr. Dwyer is a person that you could talk to and feel confident in relying upon, and he says that the property is profitable, I think that a person well might accept his representation as being accurate and true. So I think that even though, as I say, it's remarkable that they would not insist on seeing the actual records, I think that they—perhaps they did have a right to rely on the representations of Mr. Dwyer and/or Mr. Sabin."

■■ In order to establish a case of misrepresentation in avoidance of the contract, the plaintiffs must prove that the defendants made a false statement of material fact upon which the plaintiffs justifiably relied in making their decision to purchase the restaurant. Rescission may be based on an innocent misrepresentation as well as upon a fraudulent one. *Gardner v. Meiling,* 280 Or 665, 671, 674, 572 P2d 1012 (1977); *Bodenhamer v. Patterson,* 278 Or 367, 370, 563 P2d 1212 (1977); *Woodtek, Inc. v. Musulin,* 263 Or 644, 653, 503 P2d 677 (1972).

■■ There is no dispute in this case that the restaurant had been unprofitable during its year of operation. We agree with the trial court's finding that the plaintiffs did not have any knowledge of the restaurant's losses and that the defendants, through the pro forma and oral statements, represented the restaurant as being profitable in the past. Such a representation is material inasmuch as "it would be likely to affect the conduct of a reasonable man with reference to a transaction with another person." *Millikin v. Green,* 283 Or 283, 285, 583 P2d 548 (1978). The plaintiffs testified that they relied on this representation in making their decision to purchase the restaurant. It is unlikely that the plaintiffs would have bought the restaurant if they knew its true past history, especially in light of their financial inability to withstand a loss.[5] There remains, however, a question as to whether the plaintiffs were *justified* in their reliance.

■ The plaintiffs testified that they asked to review the monthly financial statements but did not insist on seeing them. Mr. Hampton was aware that certain corporate expenses had been omitted from the April pro forma statement. The footnote should have further alerted him to the fact that additional items besides corporate expenses were different from the actual expenditures.[6] Moreover, the plaintiffs did have considerable prior experience in the

---

[5] The plaintiffs testified that it was essential that the restaurant make a profit inasmuch as they only had a limited amount of money available to invest.

[6] Mr. Hampton testified that he did not remember if he saw the footnote. However, the footnote is printed clearly on the pro forma statement and the trial court implicitly found that he saw it. *See* n 3, *supra.*

ownership of restaurants, although not of the "sit down" type involved here. However, in *Bodenhamer v. Patterson, supra,* 278 Or at 374, the Supreme Court stated that

"A purchaser who has, in fact, been induced to enter a contract by an intentional misrepresentation may rescind the contract even though his reliance may have been negligent."

*See also Galego v. Knudsen,* 282 Or 155, 578 P2d 769 (1978); *Woodtek, Inc. v. Musulin, supra,* 263 Or 644. In this case, we find that the misrepresentation of the restaurant's past profitability was deliberate. Thus, the defendants cannot now claim that the plaintiff were guilty of negligence in relying upon their representations.[7]

We turn now to the question of whether rescission was timely. Plaintiffs began operation of the restaurant on June 19, 1978. Within a week thereafter a conversation between the managers of the restaurant and the plaintiffs took place. The two managers had worked at the restaurant under Kitchen Kettle's ownership, and stayed on when the plaintiffs took over operation. They were surprised to learn that Mr. Hampton thought the business was profitable. They asked him if he was sure his information was accurate and told him that, according to all the information they had, the business was showing a loss for the last seven or eight months. Mr. Hampton assured them that the business was making money.

The managers then went to discuss the matter with Dwyer.[8] Dwyer informed them that there were two sets of books and that a profit had, in fact, been made on the business. It is not clear from the testimony if this information relating to the existence of two sets of books was ever communicated to the Hamptons. As we have already noted, the managers further testified that all the financial records revealing a loss were removed from the restaurant's office when the sale took place.

---

[7] Because we conclude that the defendants' misrepresentation concerning the restaurant's past profitability is a sufficient basis for rescission, we need not discuss whether the misrepresentations concerning the existence of "other offers" was a material factor upon which the plaintiffs relied in their decision to purchase.

[8] According to the terms of their employment, the managers were entitled to a bonus if a profit had been made.

Mr. Hampton testified that by the middle of July he realized that the restaurant was not going to gross the $50,000 a month in sales as had been represented.[9] He began to experience concern about his ability to sustain the restaurant. However, he had been told by the defendants that the volume of business would be down in the summer. Nevertheless, he decided to resell the restaurant at that time, and expressed this desire to Dwyer. Dwyer offered help in reselling the restaurant. On July 28, Dwyer had the plaintiffs sign a letter addressed to him which could be made available to prospective purchasers. The letter stated that the Hamptons had no complaints regarding the restaurant as it was sold, that it was fairly represented to them and worth the price they paid. It indicated that they were selling for personal reasons and that they preferred to operate fast food restaurants, as they had done in the past, rather than a "sit down" restaurant like "14 Grains." The plaintiffs were asking $330,000 for the restaurant—$60,000 more than they paid. Mr. Hampton testified that when he signed the letter he had no reason to suspect that the restaurant had been misrepresented to him.

On September 15, the interest of Sabin and the Meatery in the lease for the restaurant's premises was sold to the Holmeses. At that same time, the Hamptons renewed their option to lease the "annex" portion of the restaurant with the Holmeses. This area was described as an undeveloped part of the restaurant used in busy times when extra space was needed. Mr. Hampton indicated that he wanted to retain the annex because it would make the restaurant more attractive to a future buyer.

On October 20, Mr. Hampton consulted an attorney because of the fact that the gross sales continued to be lower than expected. As a result, his attorney investigated the matter and discovered the past unprofitability of the restaurant. On November 2, 1978, the plaintiffs informed the defendants of their intention to rescind the sales contract and sublease. Plaintiffs continued to operate the

---

[9] As pointed out, *supra,* the trial court found the representation as to gross sales to be true. This finding is not challenged. In any event, our review of the record leads us to the same conclusion.

business for defendants until December 9, when they informed the defendants of their intent to abandon the premises and returned possession to them.

■     The law is well settled that upon discovery of fraud one who desires to rescind a contract must act promptly and return what he has received under the contract. *Edwards v. Wilcoxen,* 278 Or 91, 95, 562 P2d 1207 (1977), and cases cited therein. The plaintiffs had actual knowledge of the defendants' mispresentations after October 20. They informed the defendants of their intent to rescind promptly thereafter. The question, however, is whether they should be held to constructive notice of the fraud sooner. If they are, rescission would be barred by their delay and their actions which were inconsistent with their intent to rescind, such as continuing to operate the business and putting the property up for sale. *See MacDonald v. Shore,* 285 Or 151, 157, 590 P2d 218 (1979); *Bodenhamer v. Patterson, supra,* 278 Or at 375; *Edwards v. Wilcoxen, supra,* 270 Or at 95.

Plaintiffs knew gross sales were below expectations. However, this was occurring during the summer months, and sales were expected to be somewhat lower then. On the other hand, the managers had informed the plaintiffs the week after the sale that, as far as they knew, the restaurant had been unprofitable in the past. It is clear that circumstances existed which might have aroused the plaintiffs' suspicions. In *Brown et ux v. Hassenstab et ux,* 212 Or 246, 255, 319 P2d 929 (1957), the court stated:

> "In *Cameron v. Edgemont Investment Co.,* 136 Or 385, 299 P 698, we said, in dicta:
>
> "'* * * As was pointed out in *Whitney v. Bissell,* 75 Or 28 (146 P 141, L.R.A. 1915D, 257), notice of acts and circumstances which would put a man of ordinary prudence and intelligence upon inquiry is equivalent in the eyes of the law to knowledge of all the facts a reasonably diligent inquiry would disclose. * * * It is evidence that this rule must be applied with caution.'
>
> "In *Mesh v. Citrin,* 299 Mich 527 300 NW 870, the court, quoting from *Barrion v. Myers,* 146 Mich 510, said:
>
> "'"The law does not require action to rescind before the defrauded person is reasonably certain that he has been defrauded. If he acts with reasonable promptness

thereafter it is sufficient. The law of laches should be used as a shield and not a sword.' "

"In *Hartford Empire Co. v. Glenshaw Glass Co.,* 47 F Supp 711, the court quoted *Emery v. Third National Bank of Pittsburgh,* 308 Pa 504, 162 A 281 (reaffirmed 314 Pa 544, 171 A 881) for the following:

" 'But a bare suspicion or an opportunity to learn the truth, through the exercise of reasonable diligence does not constitute knowledge of fraud sufficient to prevent recovery.' " (Citations omitted).

■    We conclude that it was not unreasonable for the plaintiffs to wait until October to investigate the matter. Prior to that time, the only palpable information they had suggesting fraud was the managers' statements, and there was nothing to confirm those statements. Everything else they had been told was to the contrary. Sales were down but this was expected, at least through the summer. The plaintiffs could have contacted an attorney by the end of September with no more suspicion that they had in October; however, we do not feel that the delay of one month is significant. The decree of the trial court granting rescission is affirmed.

Affirmed.