PAPE' et al,
*Respondents,*

*v.*

KNOLL et al,
*Appellants.*

(24304; CA A26715)

687 P2d 1087

William M. Holmes, Bend, argued the cause for appellant Donald R. Knoll. With him on the briefs was Gray, Francher, Holmes & Hurley, Bend.

Max Merrill, Bend, argued the cause and filed the brief for appellant Ward Cook, Inc.

Dennis H. Elliott, Portland, argued the cause for respondents. With him on the brief was Elliott & Freedman, Portland.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

BUTTLER, P. J.

**BUTTLER, P. J.**

Plaintiffs brought this action against defendants Knoll and Ward Cook, Inc. (Cook) for fraud or, alternatively, for money had and received; also in the alternative, they sought damages against Knoll for breach of contract. Defendants appeal from a judgment entered on a jury verdict awarding plaintiffs $191,000 in compensatory damages against both defendants jointly, $50,000 in punitive damages against Knoll and $25,000 in punitive damages against Cook, for fraud *or* money had and received. (*See* n 4, *infra.*) Although the jury, in response to the special verdict form submitted to it, awarded plaintiffs damages against Knoll individually for breach of contract, they elected to stand on the verdict as it was incorporated in the judgment. Accordingly, the breach of contract claim is not before us.

On appeal, both defendants contend that the trial court erred in denying their motions to dismiss and for a directed verdict; Cook also assigns error to the order denying its motion for judgment notwithstanding the verdict. All of those motions challenge the sufficiency of the evidence as to each defendant on the fraud and money had and received claims and also challenge whether there was sufficient evidence to submit punitive damages to the jury. Both defendants also assert that the trial court erroneously instructed the jury as to the measure of damages applicable to an action for fraud. We review the facts in the light most favorable to plaintiffs, *Blake v. Haggard,* 46 Or App 95, 100, 610 P2d 1235, *rev den* 289 Or 587 (1980), and affirm.

Plaintiffs are members of a family investment partnership. In the spring of 1977, they learned that Knoll, a builder and developer, was offering the Carriage Trade Apartment complex, then under construction, for sale. They began negotiations that culminated in a contract under which plaintiffs agreed to purchase the complex in its partially completed state and defendant Knoll undertook to complete it, all for a fixed price as a completed apartment complex. The written contract, dated July 25, 1977, provided that the purchase price *and* the cost of completion of the project was a total of $1,632,000, subject to an adjustment of up to $118,000 in the event of increases in the cost of materials; $1,300,000 of the purchase price was to be paid by plaintiffs' assumption of a

construction loan made by defendant Cook, a mortgage banking institution, to Knoll.[1] Plaintiffs signed the assumption agreement on August 16, 1977.[2]

Shortly after the contract was signed, plaintiffs and Knoll began experiencing difficulties in completing the project. Plaintiffs complained that Knoll had neither applied for a performance bond nor complied with their requests that he furnish copies of invoices showing expenditures on the project to date, as required by the contract. Plaintiffs' inspector advised them of other difficulties with the construction. Those problems led to a meeting of all parties in mid-October, 1977, at which time Knoll withdrew from the project. Plaintiffs believed that their only option was to complete the project themselves. At that time, Roy Butler, Cook's representative in charge of inspecting construction progress and approving loan disbursements, told plaintiffs that they would have to sign a second document acknowledging that $909,385.42 had been disbursed under the construction loan before Cook would advance any additional funds to finish the apartments. Plaintiffs signed that document, took over the project in October and completed it in October, 1978, ten months after the completion date specified in plaintiffs' contract with Knoll.

In late 1977 and early 1978, plaintiffs became aware that defendant Knoll had used some of the Carriage Trade construction loan proceeds to pay for other projects in which he was involved and for which Cook had advanced various sums as the construction lender. All witnesses agreed that in July and August, 1977, the time period during which plaintiffs signed their contract with Knoll and the agreement by which they assumed the construction loan made by Cook to Knoll, no disclosures were made to plaintiffs of the diversion by

---

[1] Before the project was offered for sale, Cook had agreed to loan Knoll $575,000 for construction of Phase I of the two-phase apartment complex. Before plaintiffs became involved, Cook had committed to loan a total amount of $1,300,000 for both phases. At the time plaintiffs entered into the contract with Knoll, $490,275 of the initial commitment had been disbursed to Knoll.

[2] Under the assumption agreement, plaintiffs agreed to pay the indebtedness of the construction loan:

"* * * [I]n consideration of Ward Cook, Inc. agreeing to advance a total of ONE MILLION, THREE HUNDRED THOUSAND DOLLARS ($1,300,000.00) for the construction of a 96-unit apartment house and other improvements on the above tract of land * * *."

Knoll of $191,000 of the Carriage Trade construction loan proceeds to pay off existing obligations on three of his other projects being financed by Cook.

Butler testified that it was his practice to make inspections to ensure that the materials and labor for which payment had been requested had actually been used or were available for use on the Carriage Trade site. He further testified that none of his inspections caused him to have any suspicions that Carriage Trade loan funds were being used to pay for any other project. There was evidence, however, that the project builders' cost estimates were used to determine whether the project was over or under budget and whether the percentage of completion was in line with the percentage of disbursement of funds. The first four draw requests by Knoll, under which Cook disbursed $490,275, included, for example, a request for approximately $14,000 for fireplace materials. The Carriage Trade Apartments contained no fireplaces. The estimated lumber costs for the first 56 units was approximately $52,800, but the first four draw requests approved by Butler authorized lumber payments of over $130,000. Trusses were estimated at $8,000, but the draw request for them were for $23,000, which was disbursed.

As of mid-April, 1977, the first three draw requests drew approximately 73.5 percent of the total loan available to build the first 56 units, yet Butler estimated that in June, 1977, the project was only 50 to 60 percent complete. Knoll testified that he informed Cook that he was using the Carriage Trade loan proceeds to pay for other projects, that Cook had no objection to his doing so and that such things happen all the time. Butler also testified that Cook was handling all of Knoll's loans and that it was sometimes the practice to pay bills for one project out of a loan for another.

Randy Pape' testified that during the initial contract negotiations he had inquired about the invoices that had been paid on the project prior to July 25, 1977, and that he was given assurances by Knoll and Cook that the loan proceeds had been spent on the project. Adkins, the Pape's' attorney, testified that when the question of Pape's' assuming the Cook construction loan came up, he contacted Butler, who told him that the loan funds were used to purchase materials for the Carriage Trade and that Cook had a procedure to ensure that

the funds were so applied. Adkins stated that he passed that information on to the members of the partnership. In addition, there is evidence that Knoll also told plaintiffs that the construction loan proceeds had been used in the Carriage Trade project.

Randy Pape' testified that he relied on the representations and assurances given by Knoll and Butler when he signed the purchase contract and that knowledge of the diversion of $191,000 of the loan funds from the project would have been a material factor in his decision to purchase the property. Randy and Gary Pape' both testified that they would not have agreed to assume the $1.3 million construction loan if they had known that some of the loan proceeds had been diverted to Knoll's other projects.

In the winter of 1978, plaintiffs requested that Cook restore $250,000 to the construction loan, that being the amount that plaintiffs then thought had been diverted by Knoll from the Carriage Trade to his other projects, or to reduce the loan assumed by plaintiffs by that amount. Cook refused both requests and demanded payment in full of the $1.3 million loan before it would release its lien against the property. Rather than lose their favorable permanent financing commitment, plaintiffs closed their permanent loan to pay off Cook in full, under protest. Cook then satisfied its mortgage. This action followed.

■■ We turn first to defendants' contention that the trial court erred in refusing to grant their respective motions by which they contended that there was insufficient evidence to submit the fraud claim to the jury. To establish a case for actionable fraud, a plaintiff must prove:

> " '(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; and (9) his consequent and proximate injury.' * * *" *Webb v. Clark,* 274 Or 387, 391, 546 P2d 1078 (1976).

*See also Caldwell v. Pop's Homes, Inc.,* 54 Or App 104, 111, 634 P2d 471 (1981); *Coy v. Starling,* 53 Or App 76, 80, 630 P2d

1323, *rev den* 291 Or 662 (1981). Fraud must be proved by clear and convincing evidence. *Webb v. Clark, supra,* 274 Or at 391.

■■ Cook contends that it made no representations that the loan funds were actually expended on the Carriage Trade project. Although it appears to acknowledge Adkins' testimony that Butler did make the statements attributed to him, it relies on Butler's denial and on testimony of its attorney that Adkins had indicated to him that no representations were made as refuting that testimony. Those statements, however, go to the weight, not the sufficiency of the evidence. The same is true as to whether Knoll made the statements attributed to him. The evidence was sufficient to present a jury question as to whether either Cook or Knoll, or both, misrepresented the application of the construction loan funds.

Defendants next contend that the representations, if made, were not material to the deliberations of the plaintiffs in establishing a price or in formulating the terms of the contract to purchase the Carriage Trade. They rely on the following colloquy on cross-examination of Randy Pape' regarding the importance of the representations:

"Q. But you also reached an independent opinion that you would pay $1,632,000 for the project, didn't you?

"A. We also did that, and in reliance that Mr. Knoll would complete the project. That was —

"Q. We are talking about when you entered into the agreement right now. That is what you did, didn't you?

"A. It was $1.632 million providing Mr. Knoll would complete the project when we entered into the agreement.

"Q. In the scale of one to one hundred, how much reliance or how much did you rely on just a blank statement that you made to Mr. Knoll at this conversation and in your determination to purchase this property and sign this contract?

"A. I would say it would be on the low side of the scale, whatever scale you want to use.

"Q. Now let's put it this way. It would not be a material factor in your decision, would it?

"A. I don't believe that it was a material factor based on the representations that we had.

"Q. What were those?

"A. That the funds were used on the project.

"Q. Okay. So you don't think that was a material representation?

"A. No."

This colloquy is ambiguous in the context of Pape's' overall testimony. Although the misrepresentation may not have been material in determining the total price, he said that he did not believe that plaintiffs would have assumed the $1.3 million dollar loan if they had known that almost $200,000 of the proceeds had been diverted, and also that, in signing the contract, plaintiffs were relying on Knoll's completing the project, which was part of his undertaking under the contract. A reasonable inference is that, if plaintiffs had known of the diversion, they would not have agreed to assume all of the construction loan, lest there be insufficient money available to complete the project within the overall agreed purchase price.

Defendants further contend that the alleged misrepresentation was immaterial, because the contract provided for a fixed price, and that plaintiffs purchased on the basis of what they perceived was the value of the property, not on the basis of what funds were expended on it. A material representation is one that would be likely to affect the conduct of a reasonable person with reference to a transaction. *Milliken v. Green,* 283 Or 283, 285, 583 P2d 548 (1978); *Hampton v. Sabin,* 49 Or App 1041, 1049, 621 P2d 1202, *rev den* 290 Or 519 (1981). As pointed out above, however, even if the diversion of funds might not have affected the price plaintiffs were willing to pay for the completed project, knowledge of that fact might have affected the way in which they, as reasonable persons, would have paid it in order to assure completion. We cannot say that a jury could not so find.

Defendants also contend that there was insufficient evidence to show that plaintiffs relied on the representations. Plaintiffs' testimony showed that, in determining the purchase price of the property, they relied on the *pro forma* computations made by their accountants, based on the projected cash flow of the completed project. Defendants appear to argue that, because plaintiffs independently determined the purchase price, they could not have relied on statements about

the use of the loan proceeds. Again, however, it is not the price plaintiffs were willing to pay for the completed project that is controlling, because Knoll was required to complete it for that price. If $191,000 worth of materials and labor had not gone into the project, that amount, presumably, would need to be added to the cost of completion. Plaintiffs could have refused to assume that amount of the construction loan in order to have that additional amount available for completion and still have agreed to the price for the completed project. At least the jury could so find.

Knoll relies on *Coy v. Starling, supra,* in contending that plaintiffs were not entitled to rely on defendants' statements or failure to disclose, because plaintiffs did not examine the books and records to ascertain the amounts applied to the project. In *Coy,* we quoted from *Baker v. Casey,* 166 Or 433, 437, 112 P2d 1031 (1941):

> " 'It is, of course, well settled that a purchaser must use reasonable care for his own protection, and should not rely blindly upon statements made by a seller, and that, between parties dealing at arms' length, where no fiduciary relationship exists and no device or artifice is used to prevent an investigation, it is the general rule that a purchaser must make use of his means of knowledge, and, failing to do so, he cannot recover on the ground that he was misled by the seller.' " 53 Or App at 81.

In *Coy,* we found that the motel purchasers were not entitled to rely on the seller's representations, because they knew that the representation of annual gross income was necessarily an estimate and knew or should have known that the expense estimate did not contain data on laundry expenses, but they had declined to examine the motel's records and books offered to them for inspection.

■ The facts here are substantially different from *Coy.* Plaintiffs' contract with Knoll required him to provide a list of all materials purchased by him before the transfer of title, together with invoices showing the cost of those materials. Knoll failed to provide those records, which would have shown the diversion of funds. Moreover, the representations made by Knoll and Cook cannot be considered to be "mere puffing" or "dealer's talk." A jury could find that they were deliberate misrepresentations of fact and that plaintiffs were justified in

relying on them. *See Bodenhamer v. Patterson,* 278 Or 367, 563 P2d 1212 (1977); *Hampton v. Sabin, supra.*

■ Defendants finally contend that no injury or damage was shown to have resulted from the misrepresentation. Plaintiffs' evidence showed that, if Knoll had stayed on the job and complied with the contract, the total cost of construction, including design changes and material price increases, would have been $1,737,000. The total cost of the project after Knoll abandoned it and plaintiffs had to finish it was $1,972,000, an increase of approximately $235,000. Furthermore, plaintiffs were required to pay the $1.3 million construction loan, even though $191,000 of those proceeds were expended on projects other than the Carriage Trade project. Accordingly, we conclude that there was sufficient evidence to submit the question of injury to the jury.

■ We turn now to the question whether the trial court erred in submitting punitive damages to the jury. In *Noe v. Kaiser Foundation Hosp.,* 248 Or 420, 425, 435 P2d 306 (1967), the court stated that punitive damages are recoverable if the conduct of the defendant constitutes a sufficiently aggravated violation of societal interests to justify the sanction of punitive damages as a preventative measure. Here, there is evidence from which the jury could find that Knoll was in financial trouble with three other projects, that he started the Carriage Trade project in order to obtain additional funds from Cook to bail out the other projects, that he intended to sell the Carriage Trade before its completion so that the buyer would be saddled with the construction loan on that project, even though all of the proceeds had not gone into it, and that Knoll had misrepresented the application of the construction loan proceeds. The evidence is sufficient as to Knoll.

As to Cook, the evidence is sufficient to permit a jury to find that it knew of Knoll's financial problems and knew of the diversion of funds to the other financially troubled projects, also financed by Cook. A jury could reasonably infer that Cook went along with Knoll's scheme for its own financial benefit. There is also evidence from which the jury could find that Cook deliberately made false representations to plaintiffs. Given the evidence and the reasonable inferences that may be drawn therefrom, we conclude that there was sufficient evidence from which the jury could find an aggravated

violation of a societal interest.[3] *2-D's Logging v. Weyerhaeuser,* 53 Or App 677, 632 P2d 1319, *rev den* 292 Or 109 (1981).

Because we cannot tell from the special jury verdict[4] whether the jury found Cook liable on the ground of fraud or on the alternative theory of money had and received, we must consider its contention that there was insufficient evidence to

---

[3] No error is assigned to the trial court's instruction on punitive damages.

[4] The special verdict form, and the jury's response, is:

"1. Do you find Defendant Knoll liable for fraud and/or money had and/or received?
 __X__ (yes) _____ (no)

"2. Do you find defendant Ward Cook, Inc. liable for fraud and/or money had and received?
 __X__ (yes) _____ (no)

"If the answer to both 1 and 2 is no, go to question 5. If the answer to either 1 or 2 is yes, answer questions 3 and 4.

"3. We assess plaintiffs' damages for fraud and/or money had and received in the following amount: $191,000.

"4. (a). Do you assess punitive damages against defendant Knoll?
 __X__ (yes) _____ (no)

"(b). Do you assess punitive damages against defendant Ward Cook, Inc.?
 __X__ (yes) _____ (no)

"(c). If the answer to either 4(a) or (b) is yes, list the amount of punitive damages awarded:
Against Defendant Knoll $50,000
Against Defendant Ward Cook Inc. $25,000

"5. (a). Do you find that defendant Knoll breached his contract with the plaintiffs?
 __X__ (yes) _____ (no)

(If your answer to question 5(a) is yes, answer question 5(b) and do not answer question 6. If your answer is no, do not answer question 5(b). Go directly to question 6.)

"(b). We assess plaintiffs' damages against defendant Knoll for breach of contract in the following amount: $300,000.

"6. (a) Do you find that plaintiffs breached their contract with defendant Knoll and that he is entitled to damages?
 _____ (yes) _____ (no)

"(b). (If the answer to question 6(a) is yes), we assess defendant Knoll's damages against plaintiffs for breach of contract in the following amount:
 $_____.

"DATED this 29th day of September, 1982.

" Daniel Shoup "
 Foreman

submit plaintiffs' money had and received claim to the jury.[5] Plaintiffs contend that if Cook did not know of the diversion of funds at the time the assumption agreement was signed, both it and plaintiffs were mistaken. Accordingly, they say, there was a mutual mistake of fact, resulting in plaintiffs agreeing to pay Cook more than it was entitled to receive, to the unjust enrichment of Cook. On the other hand, Cook contends that, although there may have been a mutual mistake at that time, the relevant time is when plaintiffs paid off the loan, at which time plaintiffs knew that Knoll had diverted substantial sums to his other projects.

 That contention ignores the fact that plaintiffs were in the position of either acquiescing in Cook's demand for payment or facing a foreclosure action and losing their favorable permanent financing, which they could not close unless the construction loan mortgage was satisfied. They chose to pay the construction loan under protest. Although, as a general proposition, money paid voluntarily with full knowledge of facts that would excuse payment cannot be recovered, if the payment is made as a result of duress or coercion, recovery is permitted. The threat of a civil lawsuit does not constitute duress or coercion, unless it is made without probable cause to believe in the existence of a cause of action. *Adams v. Crater Well Drilling, Inc.,* 276 Or 789, 556 P2d 679 (1976). On this record the jury could find that Cook knew, no later than when it required plaintiffs to sign an acknowledgment that $909,385.43 of the loan had been disbursed, that a substantial portion of the disbursements had not been used in the project for which they were intended and that it did not have a valid claim against plaintiffs for the amounts so diverted. If that is true, then Cook's threat to foreclose constituted legal justification for plaintiffs' payment under protest.

██ Cook, however, argues that it was legally entitled to collect the full amount of the construction loan, because no one contends that it did not loan the full amount. That would be true as far as Knoll is concerned. However, the evidence is sufficient to permit a jury to find that, even if Cook did not misrepresent to plaintiffs the diversion of funds, it knew of it

---

[5] Knoll raised that question below, but does not argue it on appeal.

and went along with it for its financial advantage and should not be entitled to collect from plaintiffs the amount diverted.[6]

Finally, Cook contends that even if plaintiffs might otherwise be entitled to restitution of the amount of diverted funds, they may not do so here, because Cook has changed its position by accepting repayment and satisfying its mortgage, thereby losing its only security. Although it has changed its position, that change does not mean that it would be unjust to require restitution. *See Rosenblum v. First State Bank of Elgin,* 283 Or 123, 581 P2d 515 (1978). If it did not have a valid claim against plaintiffs for the diverted funds, it could not have foreclosed its mortgage for the full amount of the loan to Knoll. Its position, although changed, is no worse—it received more than that to which it was entitled. There was sufficient evidence to submit plaintiffs' money had and received claim to the jury.

Lastly, defendants contend that the trial court erred in giving this instruction:

> "If you find that there has *[sic]* been fraudulent misrepresentations or concealment with regard to the Plaintiffs, then you must consider whether Plaintiffs have been damaged, and if so, in what amounts. First, if the Defendants were guilty of fraud, fraudulent concealment, or knowingly accepting the benefits of a fraudulent transaction, they are liable to Plaintiffs for such damages as naturally and proximately resulting *[sic]* from the fraud. Further, Plaintiffs are entitled to recover the monies which were represented to be in the project but which were not in fact there.
>
> "Plaintiffs are further entitled to their out-of-pocket losses. This includes any amounts Plaintiffs have paid as a direct and proximate result of the fraudulent statements, misrepresentations or concealment by the Defendants."

The instruction was derived from *Selman v. Shirley,* 161 Or 582, 615, 85 P2d 384, 91 P2d 312 (1939), in which the court stated:

---

[6] This case is not one where the grantee assumed a construction loan *after* the project was complete and all construction funds had been disbursed. If it were, it might well be that the use of the construction money would be irrelevant; the assuming grantee would simply be agreeing to pay an outstanding mortgage on the completed project.

"* * * (1) A defrauded party is entitled to all out-of-pocket losses; (2) he is entitled to the benefit of his bargain; (3) *if the property was falsely represented as improved with or containing some items which are not there, he is entitled to the cost of installing them;* and (4) he is entitled to all consequential damages. These are merely subdivisions of the main rule, and are employed by the courts according to the facts and demands of the various cases." (Emphasis supplied.)

In *Selman,* the plaintiffs agreed to pay $2,000 for the purchase of real property from the defendant, who had falsely represented that there were 4,000 cords of wood on the property worth 50 cents per cord, when there were only 200 cords. The trial court had found that the plaintiffs were not entitled to damages, because the fair market value of the property equalled the purchase price. The Supreme Court, however, concluded that the plaintiffs were entitled to the benefit of their bargain, and allowed recovery for the value of the missing wood. *Selman* has been recognized as a leading decision because of its approval of a flexible approach to measuring damages in an action for fraud. *See* Prosser, Torts 735, § 110 (1971).

Although subsequent Oregon decisions have credited *Selman* with announcing the adoption of the benefit-of-the-bargain rule in Oregon, *see Galego v. Knudsen,* 281 Or 43, 51, 573 P2d 313, *mod* 282 Or 155, 578 P2d 769 (1978); *Otte v. Ron Tonkin Chevrolet Co.,* 264 Or 265, 503 P2d 716 (1973); *Horner v. Wagy,* 173 Or 441, 146 P2d 92 (1944), none of the cases has considered whether the *Selman* method of calculating damages is merely an aspect of the "benefit-of-the-bargain" rule, or whether it is a rule in itself. Neither have the courts specifically disapproved the measure of damages applied in *Selman.* In *Galego v. Knudsen, supra,* the court stated:

"It is well established in this state that, in an action for fraud, plaintiff's recovery is limited to that measured by the 'out-of-pocket' rule unless the actionable misrepresentation was a warranty of value, in which case plaintiff could recover under the 'benefit-of-the-bargain' rule. *Selman v. Shirley,* 161 Or 582, 609, 85 P2d 384, 91 P2d 312 (1939). Plaintiff in this case is limited to the damages recoverable under the 'out-of-pocket' rule. Such damages are measured by the difference between the purchase price of the property and the fair market value of the same property on the date of the sale.[4] *Van de Wiele v. Garbade,* 60 Or 585, 591, 120 P 752 (1912).

> The burden, of course, is on the plaintiff to establish the purchase price and the fair market value of the property."

In note 4, the court stated:

> "In contrast to the 'out-of-pocket' measure of damages applicable in the present case, the 'benefit-of-the-bargain' measure is determined by the difference between the actual value of the property received and its value had the representations as made been true. *See Selman v. Shirley,* 161 Or 582, 609, 85 P2d 384, 91 P2d 312 (1939)." 281 Or at 43.

Although that statement has created some confusion as to the current state of the law, we conclude that the measure of damages applied in *Selman,* either as a variant of the other two, or as a third measure, is alive and well and was applied appropriately in the instant case.

 There are several reasons for so concluding. As to the damages awardable against either defendant, it is difficult to see how the application of the "out-of-pocket" loss rule, which focuses on the fair market value of the property, would compensate plaintiffs for expenditures that they were required to make as a result of the misrepresentation. Although the "benefit-of-the-bargain" rule was designed to prevent a plaintiff from being deprived of the bargain which he was fraudulently induced to expect, *Horner v. Wagy, supra,* 173 Or at 446, it is inapplicable here, because there was no warranty of value. It was not the value of the completed project itself which was misrepresented, but rather a component of the cost of development of that property that could affect the way in which plaintiffs paid the price. The measure of damages applied in *Selman* is peculiarly appropriate to this situation in that it allows recovery of the exact amount of the loan represented by both defendants to have been used in the construction of the apartment. What the plaintiffs sought here was a completed project for the contract price of $1,632,000; they did not get that, because, in part at least, construction loan funds had been diverted to Knoll's other projects. Consequently, we conclude that the trial court did not err in giving the challenged instruction or in excluding

evidence of the fair market value of the property on grounds of irrelevancy.[7]

Affirmed.

---

[7] For those reasons, we need not consider defendants' contentions that the court erred in failing to give their requested instruction incorporating the measure of damages for fraud under the "out-of-pocket" rule, or that there was error in granting plaintiffs' motion *in limine* to exclude evidence of the market value of the property.