Argued and submitted September 7, 1984, affirmed July 3, 1985

# CREDIT ALLIANCE CORPORATION,
## *Respondent,*

### *v.*

# AMHOIST CREDIT CORPORATION et al,
## *Appellants.*

### (A8209-05542; CA A30521)

702 P2d 1121

Stephen S. Walters, Portland, argued the cause and filed the briefs for appellants.

John P. Davenport, III, Portland, argued the cause and filed the brief for respondent.

Before Joseph, Chief Judge, and Warden and Newman, Judges.

NEWMAN, J.

## NEWMAN, J.

Defendant[1] appeals a judgment for $625,000 damages for conversion. We affirm.

Plaintiff, a commercial lender, and defendant, an equipment manufacturer, held conflicting security interests in four pieces of heavy equipment that Layton Sales and Supply Company (Layton), a retail seller of equipment, owned. Under two loan agreements between plaintiff, as mortgagee, and Layton, as mortgagor, dated April 12, 1978, and May 25, 1979, Layton granted plaintiff security interests in all of Layton's existing and after-acquired inventory. Those agreements each secured repayment of plaintiff's loans to Layton, known as "direct loans," in sums, respectively, of $8,000 and $54,000. Under a "future advances" clause, both loan agreements also secured all "mortgage obligations," which the agreements defined as:

> "*[a]ny and all loans, advances, payments, extensions of credit, endorsements, guaranties, benefits and financial accommodations* heretofore or hereafter made, granted, or extended by Mortgagee or which Mortgagee hereunder would become obligated to make, grant to or extend to or for the account of Mortgagor and any and all interests, commissions, obligations, liabilities, indebtedness, charges and defenses heretofore or hereafter chargeable against Mortgagor by Mortgagee or upon which Mortgagor may be or have become liable as endorser of guarantor, *and any and all renewals or extensions of any of the foregoing no matter how or when arising and whether under any present or future agreement or instrument* between Mortgagor and Mortgagee or otherwise, *including without limitation, any and all obligations and/or indebtedness of any and every kind arising out of one or more conditional sales contracts,* equipment lease agreements, *notes, security agreements, trust receipts* and/or bailment agreements, and the amount due upon any notes or other obligations given to or received by Mortgagee for or on account of any of the foregoing, and the performance and fulfillment by Mortgagor of all of the terms, conditions, premises, covenants, provisions, and warranties contained in this Mortgage and in any note or notes secured hereby and in

---

[1] Defendant Amhoist Credit Corporation is a subsidiary of defendant American Hoist & Derrick Company. The two companies were treated as one for the purpose of this litigation and are referred to collectively as "defendant."

any present or future agreement or instrument between Mortgagor and Mortgagee." (Emphasis supplied.)

Plaintiff promptly filed Uniform Commercial Code financing statements which described Layton as the debtor and the collateral as including present and after-acquired inventory.

Layton repaid to plaintiff both of the direct loans before it acquired the equipment from defendant. The financing statements, however, remained of record. Plaintiff continued to advance funds to Layton on approximately 40 additional occasions. At the time of the alleged conversion, Layton owed more than $1,000,000 to plaintiff, consisting of (1) direct loans, which Layton used to consolidate old debts, to purchase inventory of equipment and to perform other general business functions; (2) retail financing loans to Layton's customers; and (3) "flooring transactions," in which plaintiff accepted assignments of conditional sales contracts between Layton and manufacturers who had sold equipment to it. Plaintiff asserts that all of the debts were "mortgage obligations" secured by the loan agreements and covered by the filed financing statements.

Defendant appointed Layton as one of its distributors on March 7, 1980. It had learned in a previous credit check that plaintiff was one of Layton's creditors but did not find out what kind of security interests plaintiff held. Defendant did not examine plaintiff's filed financing statements or contact plaintiff. At the time of the distributorship agreement, defendant sold the four pieces of equipment to Layton, and Layton gave defendant a purchase money security interest in each piece. On May 27, 1980, defendant filed a financing statement covering the equipment and shipped the equipment to Layton. Plaintiff's previous loan agreements and filed financing statements were still in effect. Defendant did not notify plaintiff in writing of its security interest under ORS 79.3120(3)(b).[2] Layton defaulted in its payments to defendant

---

[2] ORS 79.3120(3) provides:

"A perfected purchase money security interest in inventory has priority over a conflicting security interest in the same inventory and also has priority in identifiable cash proceeds received on or before the delivery of the inventory to a buyer if:

"(a) The purchase money security interest is perfected at the time the debtor receives possession of the inventory; and

on the equipment, and in November, 1981, defendant took back the equipment pursuant to an agreement with Layton. In March, 1982, Layton filed a petition in bankruptcy.

On May 28, 1982, plaintiff demanded that defendant surrender the equipment or pay $625,000, the amount which plaintiff asserted was its market value. Plaintiff claimed that it held a prior security interest in the equipment. Defendant refused the demand and plaintiff sued. By a special verdict the jury found that (1) plaintiff held superior rights in the equipment, and defendant had converted it when it took it back; (2) the market value of the equipment was $625,000; and (3) plaintiff was not entitled to punitive damages.

Defendant assigns as error that the court denied its motion for a directed verdict at the conclusion of plaintiff's case. Defendant argued below:

> "We have, in each of these agreements, * * * direct loans to Layton Sales & Supply secured by equipment which might have been used for operating expenses or to purchase equipment.

> "It is also the undisputed testimony that they engaged in any number of different types of transactions with Layton Sales & Supply. They have had situations where Layton would buy a piece of equipment from a manufacturer and the Plaintiff would be assigned a contract.

> "They have had situations where Layton would sell a piece of equipment to a resale dealer and the Plaintiff would finance that transaction.

> "* * * * *

> "It's our contention that under *Community Bank v. Jones,*

---

"(b) The purchase money secured party gives notification in writing to the holder of the conflicting security interest if the holder had filed a financing statement covering the same types of inventory (A) before the date of the filing made by the purchase money secured party, or (B) before the beginning of the 21-day period where the purchase money security interest is temporarily perfected without filing or possession as provided in ORS 79.3040(5); and

"(c) The holder of the conflicting security interest receives the notification within five years before the debtor receives possession of the inventory; and

"(d) The notification states that the person giving the notice has or expects to acquire a purchase money security interest in inventory of the debtor, describing such inventory by item or type."

[278 Or 647, 566 P2d 470 (1977),] the only obligations which might be considered for purposes of this action, at least under the evidence the Plaintiff has introduced, are direct loan transactions which were of the type that were covered in those security agreements that they have in evidence.

"* * * * *

"I think that on the record before the Court right now, the jury simply would have to speculate as to the amount of debt with respect to any particular type of transaction; they cannot decide what that debt was with respect to those transactions which are at issue here."

Whether the court erred depends on (1) whether defendant's motion required the court to decide a question of fact for the jury and (2), if so, whether there was evidence from which the jury could have resolved the question against defendant.

In *Community Bank v. Jones,* 278 Or 647, 566 P2d 470 (1977), the bank sued its debtor, an automobile dealer, and others to whom he had sold automobiles for a declaration that its security interest in the debtor's automobile inventory had priority. The action was equitable, and the court's review was *de novo.* 278 Or at 651, 652. The security agreement contained the following provisions:

"Section 2. Loan Agreement.

"2.1  Amount of Loan. The secured party from time to time will lend the debtor at debtor's request, such sums as the secured party in his discretion believes are adequately secured by this agreement.

"* * * * *

"2.3  Debtor's Notes. All loans shall be evidenced by debtor's promissory note or notes payable either on demand or on such maturity as the secured party may fix * * *.

"2.4  Other Charges. In addition to the principal and interest of the notes the debtor shall pay to the secured party upon his demand, all expenses incurred by the secured party to audit and service debtor's account and to preserve, collect, protect his interest in or realize on the collateral, including counsel fees and legal expenses, taxes and insurance premiums. All such expenses shall be part of the obligation secured by the collateral and shall bear interest at *10%* per annum from the date advanced by the secured party until paid.

"* * * * *

"Section 3. Collateral.

"To secure the payment and performance of all obligations of the debtor set forth on this agreement, the note or notes and any other obligations of the debtor to the secured party, the debtor grants to the secured party a security interest in the following collateral * * *." 278 Or at 659-61.

The bank argued that, in addition to advances used to purchase automobiles, the security agreement covered overdrafts on the dealer's checking account at the bank and a December 17, 1973, advance to cover overdrafts.

As to the overdrafts, the court ruled that the security agreement did not cover them:

"Section 3 of the security agreement is captioned 'Collateral' and is primarily designed to identify the collateral subject to the security agreement, not the obligations which that collateral secures. Section 2 of the agreement is designated as the 'Loan Agreement' section. Plaintiff was free to provide therein what sums owed by Jones were secured. Construing the contract as a whole, we read [section 2] as setting forth all of the obligations secured by the agreement, to-wit: loans evidenced by notes, interest, all expenses incurred by the secured party to audit and service debtor's account and to preserve, collect, protect his interest in or realize on the collateral, including counsel fees and legal expenses, taxes and insurance premiums. The reference to notes may be reasonably construed to include the trust receipts given by Jones to plaintiff. But, finding no reference to overdrafts in this section, we conclude that obligations secured by the agreement include neither the overdrafts nor the costs and attorney fees pertaining thereto." 278 Or at 665-66.

The court then turned to the loan of December 17, 1973, to cover the overdrafts, evidenced by the trust receipt of that date. It continued:

"The general test applied by courts to determine whether a future advance falls within the future advances clause of a particular security agreement is that enunciated in *National Bank of Eastern Arkansas v. Blankenship,* 177 F Supp 677 (ED Ark 1959), *aff'd sub nom. National Bank of Eastern Arkansas v. General Mills, Inc.,* 283 F2d 574 (8th Cir 1960). There the district court held that no matter how the clause is drafted, the future advances, to be covered, must 'be of the same class as the primary obligation * * * and so related to it

that the consent of the debtor to its inclusion may be inferred.' * * *

"The loan evidenced by the last trust receipt of December 17, 1973, was credited directly by plaintiff to Jones' checking account. The only practical effect of this transaction was to reduce a portion of the previously unsecured debt created by the overdrafts against Jones' checking account. Unlike the other monies loaned pursuant to the security agreement, the December 17 transaction gave Jones no financing with which to floor new inventory. The funds, once credited to his checking account, were, as a consequence of the Bank's decision to pay checks only against collected funds, unavailable to Jones." 278 Or at 666.

Although the court acknowledged that "[t]he reference to notes [in section two] may be reasonably construed to include the trust receipts given by Jones to plaintiff," 278 Or at 665, the text of section two of the loan agreement did not unambiguously cover the December 17 advance. The focus of the court's inquiry, therefore, was on the parties' intent when they executed the original loan agreement.[3] In exercising *de novo* review, the court in *Community Bank* made a factual determination that section 2 of the loan agreement did not cover the December 17 advance:

> "*Although this transaction appears in form to conform to the security agreement, we find its substance to be different in kind and not related to the purpose intended by the parties when they entered into the October 28 security agreement.* To hold otherwise would be to allow a creditor secured as to one line of financing to retroactively secure a second separate indebtedness (not included in the loan section of the security agreement), and to step ahead of other holding perfected security interests in the same property." 278 Or at 666-67. (Citations omitted; emphasis supplied.)

Here, the definitions of "mortgage obligations" in the loan agreements appear to cover more than just "direct loans," but they do not unambiguously cover the subsequent transactions between plaintiff and Layton. Because, as in *Community Bank,* the loan agreements are ambiguous as to the obligations covered, it is a question of fact what they

---

[3] The court repeatedly emphasized that a security agreement is a "bargain in fact" and that the parties are free to agree to its terms. Although at one point the court appears to say that it does not matter how a future advance clause is drafted, 278 Or at 666, the language of the contract is nonetheless relevant, as *Community Bank* illustrates.

covered. Unlike in *Community Bank,* however, the action here is for conversion and was tried to a jury. We must consider, therefore, whether there was evidence from which the jury could have found that the loan agreements covered more than plaintiff's direct loans to Layton. Defendants' motion for a directed verdict assumed that such evidence was lacking and that the question, therefore, was one of law.

Reeder was plaintiff's senior vice-president and had responsibility for the Layton account. He testified that plaintiff's business was to finance dealers' equipment inventory. He also testified that the first two loans to Layton were direct loans. In argument on its motion for a directed verdict, defendant acknowledged that the direct loans might have been used for the purchase of inventory or for general operating expenses. Before defendant's sales to Layton and up to the time of the alleged conversion, plaintiff and Layton had engaged in a series of transactions, including subsequent direct loans, retail financing loans and "flooring" transactions. Both on direct and cross-examination Reeder gave testimony from which the jury could find that additional transactions, and not only subsequent direct loans, were similar in kind and related to one of the purposes—financing Layton's inventory—intended by the parties in making the original direct loans and in executing the original loan agreements.[4] Moreover, the definition of "mortgage obligations" in

---

[4] Reeder testified on direct examination:

"Q. And what type of business transactions, as you recall, were being done at that time?

"A. They [plaintiff] were financing inventory for *Layton Sales Equipment.* They were buying retail paper. In other words, contracts where Layton would find a buyer for the equipment. We would purchase the contract from Layton.

"* * * * *

"Q. When you say that they were financing the inventory, how does that work?

"A. Well, we have done it several ways. We could acquire the paper on a contract from another manufacturer where they entered into an agreement for Layton to buy the equipment, or we could enter into a loan where we loaned the money and where the transaction was between Layton and ourselves directly. We pay Layton or another party, whether it be a manufacturer or otherwise."

On cross-examination he testified:

"Q: Okay. So that was another situation where you had a retail sale and then

the loan agreements was consistent with coverage of those additional transactions. The jury could, therefore, infer that plaintiff and Layton contemplated that course of financing when they made the original loan agreements. *See* II Gilmore, *Security Interests in Personal Property*, § 35.5 (1965).

■    Evidence, therefore, was not lacking from which the jury could find that the original loan agreements covered not only the original and subsequent direct loans, but also other obligations of Layton incurred to plaintiff in subsequent transactions. The trial court, therefore, correctly denied defendant's motion for a directed verdict.

■    Defendant's second assignment of error is that the court erred when it refused to give this jury instruction:

> "The amount of damages which Plaintiff may recover, if any, may not exceed the amount of Layton's debt to Plaintiff with respect to direct loans. You may not consider any contingent liability of Layton to Plaintiff, nor amounts owed to Plaintiff as a result of repossessions, leases, or contracts assigned to Plaintiff by equipment manufacturers."

This was the only instruction that defendant requested on the *Community Bank* issue.[5] The requested instruction assumed

---

a repossession and Layton had to buy the contract, buy the contract back?

"A. They were obligated to buy the contract back.

"Q. And that's different than a direct loan transaction?

"A. I don't know that. Well, I don't quite understand.

"Q. It's not a situation where you advance money directly from *[sic]* Layton on a loan basis, is it?

"A. Well, there's a lot of transactions where we, whether we advance the cash or they tell us to pay somebody else, I don't know whether that would be — well, what difference that would make.

"Q. Would you answer the question? That's not the same type of transaction as when you advance money directly to Layton for them to either purchase the equipment or for them to use for operating expenses or for whatever purpose?

"A. There are certain differences, but I don't know whether I can say it's not the same type of transaction. I don't understand what the question is.

"Q. There are differences?

"A. There are differences in each and every contract."

[5] The trial court's instructions that related to the question of how the jury should interpret the security agreements were:

"In determining whether Layton agreed that Credit Alliance would have a

that the trial court should decide, as a matter of law, that the original loan agreements covered only direct loans. Because there was evidence from which the jury could have found that, in addition to direct loans, other advances of plaintiff to Layton were covered by the original loan agreements, the trial court did not err in refusing to give the requested instruction.

■ Defendant also argues that the trial court erred when it refused to instruct the jury that defendant's purchase money security interest had priority if plaintiff was not prejudiced by a lack of notice. Defendant *perfected* its purchase money security interest in the equipment that it had delivered to Layton when it filed a financing statement. Defendant could have gained *priority,* however, over plaintiff's prior perfected inventory security interests in that equipment only if it gave a timely notice in writing to plaintiff that described the equipment by item or type and informed plaintiff that defendant had or expected to acquire a purchase money security interest in it. ORS 79.3120(3). It never gave the notice. Apparently it did not know, and had not checked the public records to find out, that plaintiff had already filed a financing statement covering the equipment. Defendant is not

security interest which covered the equipment involved here, your task is to decide the intention of Layton and Credit Alliance on that issue.

"In other words, you are to determine the bargain, in fact, between Layton and Credit Alliance. You may consider the language they used in written or other dealings, and you may consider implications from other circumstances, including the course of dealing or course of performance.

"Course of dealing is a sequence of conduct between two parties to a transaction.

"The express terms of a written contract control over course of dealings and course of performance when the two cannot reasonably be reconciled. Even when the intention is controlled by the written contract, the parties' course of performance or course of conduct may be considered to decide if there was a later waiver or modification of any written contract.

"Amhoist contends that, even if Layton agreed at one time that Credit Alliance was to have a security interest in Layton's inventory to secure all of its obligations to Credit Alliance, that agreement was modified so that it did not include the equipment at issue in this case.

"Credit Alliance contends there was no such modification. They contend first that there was an agreement, and second that there was no modification of the agreement.

"Parties to an agreement may change the agreement or substitute another agreement and the later agreement would supercede the first to the extent the two are inconsistent."

entitled to priority, even if plaintiff had actual notice and was not prejudiced by a lack of notice under ORS 79.3120(3). *See In re Beverage*, 30 UCC Rep 369 (MD Pa Bankr 1980); *First National Bank of Sullivan County v. Mann*, 22 UCC Rep 254 (ED Tenn Bankr 1977).

■     Defendant's last three assignments of error relate to plaintiff's claim for punitive damages. Defendant argues that the trial court erred when it refused to grant a directed verdict against plaintiff on punitive damages, admitted plaintiff's evidence of defendant's financial worth over defendant's objection and gave jury instructions on punitive damages. The jury, however, did not award punitive damages. Any error the trial court may have made when it denied defendant's motion for directed verdict on punitive damages and instructed the jury on punitive damages, was harmless.

■     Defendant argues, however, that the evidence of defendant's financial worth may have prejudiced the jury's decision on general damages. Even if admission of the evidence was error, evidential error is not presumed to be prejudicial. Defendant has the burden to show that the evidence of financial worth affected a substantial right of defendant. OEC 103. The trial court's instructions to the jury on general damages were:

> "If Credit Alliance was the rightful possessor of the property at the time of any conversion by the Defendant, Amhoist, then Credit Alliance is entitled to recover as damages the full value of the property or the amount of Layton's debt to Plaintiff, whichever is less.
>
> "The amount of Credit Alliance's damages, if any, are to be determined by the market value of the equipment involved here at the time it was taken into Amhoist's possession.
>
> "The market value of the equipment is the price it will bring in a fair market if reasonable efforts were made to find a purchaser who would pay the highest price."

Defendant did not object to that instruction. It introduced no evidence that suggested a market value for the equipment lower than $625,000, the amount that the jury awarded. Defendant's brief recognizes that the verdict represented "the lowest possible amount" and argues only that the verdict "may well have been different" in some manner not specified "had plaintiff not been permitted to argue in favor of a

substantially higher award and introduce evidence of Amhoist's deep pocket." The evidence of defendant's financial worth was unrelated to the questions of whether defendant converted the equipment and the market value of the equipment. Defendant has not sustained its burden to show that the evidence of its financial worth prejudiced it.

Affirmed.