Argued and submitted November 15, 1985, affirmed and remanded August 13, reconsideration denied October 17, petition for review denied November 25, 1986
(302 Or 299)

GERKE et al,
*Respondents,*

*v.*

BURTON ENTERPRISES, INC. et al,
*Appellants,*

*and*

ADMINISTRATION SERVICE CORP.,
*Intervenor-Appellant.*

(8860; CA A32908)

723 P2d 1061

Clayton C. Patrick, Salem, argued the cause for appellants. With him on the briefs were William D. Brandt and Ferder, Ogdahl & Brandt, Salem.

William P. Buck, Portland, argued the cause for intervenor-appellant. With him on the brief was MacMillan & Scholz, P.C., Portland.

Roy Kilpatrick, Mt. Vernon, and Marvin S. Nepom, Portland, argued the cause for respondents. On the briefs was Marvin S. Nepom, Portland.

Before Richardson, Presiding Judge, and Warden and Newman, Judges.

NEWMAN, J.

## NEWMAN, J.

Plaintiffs brought this action for fraud in their purchase of a motel from defendants. Defendants moved for a directed verdict at the conclusion of plaintiffs' case and after all of the evidence had been presented. The court denied the motions. The jury returned a verdict for plaintiffs for $360,000 general damages and $100,000 punitive damages. On defendants' motion, the court granted a judgment n.o.v. as to punitive damages. The court also awarded plaintiffs $75,000 attorney fees and granted them an equitable setoff against the contract balance as of August 14, 1981, the date of the contract, in the amount of the verdict plus the attorney fees. The court denied the motion of Administration Service Corp. (ASC) to intervene. It was made before the court entered judgment but after the jury verdict and after the court had granted the setoff. The court also denied defendants' motion for a judgment n.o.v. based on juror misconduct. Both defendants and ASC appeal. We remand plaintiffs' judgment for modification, otherwise affirm it and affirm on ASC's appeal.

In 1981, defendant Robert Burton (Burton) listed the Sunset Inn Motel in John Day with a realtor. The motel included a restaurant and lounge. In May, the realtor asked Burton for information for prospective buyers, and he gave the realtor gross sales figures from its 1980 operating statements. The realtor also asked Burton for income information, and he responded that he "worked toward" net spendable income of 40% of gross in the motel and 10% in the restaurant and lounge. On the basis of figures provided by Burton, the realtor calculated the net income for the complex at $167,370. The 1980 operating statements showed that the "net income" was actually $83,441.

In July, plaintiff John Gerke (Gerke) responded to an advertisement that the realtor had placed in the *Wall Street Journal.* The realtor then sent him a letter and enclosed an "information sheet" which stated that the net income of the complex was "$170,000 (approximately)." After inspecting the property, Gerke met with Burton. The parties' accounts of this meeting differ significantly. Gerke testified that he performed calculations at the meeting that used the $170,000 income figure and that both Burton and the realtor knew that

he was using that figure.[1] Burton and the realtor testified that, although they knew that Gerke was making calculations, they did not know of his reliance on the $170,000 figure. Gerke agreed to purchase the complex for $1,100,000, with $300,000 down. Thereafter, the parties signed the earnest money agreement, which was contingent on Gerke's receipt of a 1981 operating statement.

Burton then asked his accountant for the 1981 operating statements. The accountant indicated that he could not put them together quickly, but that he could provide a less comprehensive statement. The accountant prepared statements which contained gross, but not net, income figures. He attached a disclaimer to the statements:

> "As such special purpose financial statements were prepared primarily from cash basis financial records of the company for the period without audit or verification, we do not express an opinion or any other form of assurance on them.

> "Further, such statements are not intended to reflect the company's financial position or results of operations for the period since substantially all disclosures as well as the balance sheet, statements of income and retained earnings, and changes in financial position required by generally accepted accounting principles have been omitted."

The realtor delivered the statements to Gerke, who testified that, although he was dissatisfied with them, he used the "gross profit"[2] figures they contained to confirm that the motel was making at least $170,000 in net income. The accountant's statements contained errors and overstated the "gross profit." The sale closed on August 14, 1981, and plaintiffs went into possession of the complex.

On May 7, 1982, defendants assigned their sellers'

---

[1] Gerke testified:

"I used the napkin because it was there. I wrote down 170,000. I said we have a 170,000 dollars. We have a debt service of $99,000, which left me cash of $71,000. Neither Mr. Burton nor Mr. Mackey made any comment about it. They didn't say, where is the 170,000, or that is wrong. They just nodded their heads or made some general comment like yes, that is right or I agree or yes. They certainly did not make any negative comment. Nobody said that is wrong."

[2] As used by Burton and his accountant, gross profit was calculated by subtracting the cost of labor and supplies from gross sales.

interest in the contract to ASC to secure their note to it for $220,000. The assignment was recorded. After the sale closed, Gerke concluded that the figures he had been given were wrong, and plaintiffs filed the action on March 1, 1983.

In their first two assignments of error, defendants contend that the court erred in denying their motions for directed verdict. A motion for directed verdict is a request "for a ruling on the *sufficiency* of the opposing party's evidence; it is not a request to *weigh* the evidence when there is sufficient evidence to go to the jury." *Godell v. Johnson,* 244 Or 587, 591, 418 P2d 505 (1966). (Emphasis in original.) In determining whether the trial court erred by denying defendants' motions, we interpret the evidence in the light most favorable to plaintiffs, giving them the benefit of every reasonable inference supported by the record. *Schlosser v. Clackamas Water District,* 60 Or App 617, 619, 655 P2d 194 (1982).

■ To establish fraud, a plaintiff must plead and prove: (1) a representation; (2) its falsity; (3) its materiality; (4) the defendant's knowledge of its falsity or his recklessness in that respect; (5) the defendant's intent that plaintiff should act on it in the manner reasonably contemplated; (6) the plaintiff's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; and (9) his damage. *Musgrave et ux v. Lucas et ux,* 193 Or 401, 410, 238 P2d 780 (1951); *Banks v. Martin,* 78 Or App 550, 554, 717 P2d 1192 (1986). A person alleging fraud has the burden of proving the elements by clear and convincing evidence. *Miller et ux v. Protrka et ux,* 193 Or 585, 592, 238 P2d 753 (1951); *Coy v. Starling,* 53 Or App 76, 80, 630 P2d 1323, *rev den* 291 Or 662 (1981).

■ Defendants first contend that the representation that the net income of the complex was $170,000 was not false. They argue that the term "net income" is vague and that, under some acceptable methods of calculation, the net income was $170,000 for 1980. Their argument is unpersuasive. Defendants' figures are substantially different from the net income figures in the 1980 operating statements, which Burton possessed throughout the transaction but did not deliver or show to Gerke before the closing. Moreover, the jury could have found that, on the basis of his meeting with Gerke, Burton knew that Gerke interpreted the term "net income" as it was used in those statements. Under the circumstances,

there was sufficient evidence to go to the jury that he misrepresented the net income of the complex. *See Heverly v. Kirkendall,* 257 Or 232, 234, 478 P2d 381 (1970).

■ Next, defendants argue that Burton had no knowledge that the representations were false. The jury could have inferred from the evidence that he was aware of the "net income" figures in the 1980 operating statements when he gave the realtor the gross sales figures from those statements. Moreover, the realtor should have been aware of the very rough nature of the $170,000 figure that he calculated. Accordingly, the jury could have found that both Burton and his agent, the realtor, were at least reckless in initially representing to Gerke that the net income was "$170,000 (approximately)" and in acquiescing in Gerke's use of that figure at their meeting.

Defendants also argue that Gerke had no right to rely on Burton's representations concerning net income. In *Coy v. Starling, supra,* we held that the purchaser of a motel had no right to rely on the seller's representation of gross income. We stated:

> "In order to secure relief on the ground of fraud, the person claiming reliance must have a right to rely upon the representation. Generally speaking, there is a duty on the part of a purchaser to use some measure of protection and precaution to safeguard his interests." 53 Or App at 80.

We relied heavily on *Miller et ux v. Protrka et ux, supra,* in which the court said:

> "A purchaser must use reasonable care for his own protection and cannot rely blindly on the seller's statements but must make use of his means of knowledge and, failing to do so, cannot claim that he was misled." 193 Or at 598.

The facts here are substantially different from the facts in *Coy* and *Miller.* The purchasers in those cases did nothing to confirm the representations that the sellers had made, and they declined to inspect the books when the sellers offered them.

■ Gerke requested the 1981 operating statements which Burton promised to deliver but failed to provide. Moreover, Gerke testified that, although the statements that he did

receive from Burton's accountant instead of the 1981 operating statements were incomplete, he used them to confirm the $170,000 net income figure. The jury could have found that Gerke tried to confirm the representation of net income and for that purpose had a right to use the statements which he had received from the accountant. Under the circumstances, there was sufficient evidence to go to the jury on the question of Gerke's right to rely on the representation. *Pape' v. Knoll,* 69 Or App 372, 380, 687 P2d 1087, *rev den* 298 Or 150 (1984); *see also Hampton v. Sabin,* 49 Or App 1041, 621 P2d 1202 (1980), *rev den* 290 Or 519 (1981); *Williams v. Collins,* 42 Or App 481, 600 P2d 1235, *rev den* 288 Or 173 (1979).

■■ Finally, defendants argue that "the most glaring deficiency in the plaintiffs' case was the complete failure to prove that they had been damaged." Plaintiffs assert, and defendants do not dispute, that the measure of damages is the difference between the purchase price and the fair market value of the property at the time of the sale. *Galego v. Knudsen,* 282 Or 155, 164, 578 P2d 769 (1978). Defendants offered testimony of three experts in support of their position that the complex was worth the $1,100,000 that plaintiffs paid for it. Plaintiffs' evidence of the complex's market value was Gerke's own testimony that it was worth $590,000. The question is whether Gerke's testimony, standing alone, is sufficient to submit the question of damage to the jury. Faced with a similar question in a fraud action arising out of the sale of an automobile, the Supreme Court stated:

> "We [continue] to recognize that an owner is qualified to testify to the value of that which he owns even in the absence of his qualifications as an expert in evaluating property of the kind in question." *Osborn v. Teague Chevrolet,* 254 Or 486, 489, 459 P2d 988 (1969).

We hold that the court did not err in denying the motions for a directed verdict.

■ Defendants' third and fourth assignments of error concern punitive damages. They assert that the court erred in not striking the claim for punitive damages before trial; they also assert that it erred in not directing a verdict on punitive damages both after plaintiffs' case and after all the evidence was presented. The court, however, did grant defendants' motion for a judgment n.o.v. on the issue, and they do not

show how they were prejudiced as a result of the court not striking the claim for punitive damages and also allowing the issue to be tried and submitted to the jury. Any errors were harmless. *See Credit Alliance v. Amhoist Credit,* 74 Or App 257, 268, 702 P2d 1121 (1985).[3]

■     Defendants also assign as error that the court denied their motion relating to juror misconduct. After trial, a juror wrote a letter to the judge in which she stated that the conduct of another juror, Johnson, had prevented a fair weighing of the evidence in the jury room. The court revealed that correspondence to defendants' counsel. Although the court refused to issue an order allowing defendants to interview the jurors, it did not forbid defendants from investigating on their own. They obtained the affidavits of three jurors, which they submitted with a supplemental motion for new trial. The affidavits stated that Johnson, an attorney, "totally dominated" the proceedings, told the jurors that "all doubts were to be resolved against the Burtons" and "thoroughly reprimanded" jurors who voiced opposing opinions.

As the Supreme Court stated in *Carson v. Bauer,* 234 Or 333, 382 P2d 79 (1963):

> "The kind of misconduct of a juror that will be considered in an attack upon a verdict by a juror's affidavit * * * is misconduct that amounts to fraud, bribery, forcible coercion or any other obstruction of justice that would subject the offender to a criminal prosecution therefor. We do not necessarily use the words 'fraud,' 'bribery,' 'forcible coercion,' and 'obstruction of justice' in a purely technical sense, but as words that denote such serious breach of juror's duties that the trial judge would be justified in citing him for nothing less than a contempt of court." 234 Or at 345.

The affidavits do not disclose misconduct sufficient to set aside the verdict.

Defendants also argue that Johnson was biased against them, because her husband (who was also her law partner) was prosecuting a similar fraud case before the same jury panel. The record, however, does not support the conclusion that Johnson was biased against defendants or that she

---

[3] Plaintiffs did not cross-appeal or assign as error that the court granted the judgment n.o.v.

failed to disclose possible bias in *voir dire. See State v. Salas,* 68 Or App 68, 680 P2d 706, *rev den* 297 Or 601 (1984). The court did not err in refusing to set aside the verdict.[4]

■     ASC assigns as error that the court denied its motion to intervene[5] and granted plaintiffs an equitable setoff against the contract balance. ASC argues that it has a right to intervene to protect its interest in the contract and that plaintiffs' failure to join it as a party bars them from obtaining a setoff. Because of the timing of ASC's motion to intervene, however, the court had discretion whether to allow it. ORCP 33C; *Barendrecht v. Clark,* 244 Or 524, 528, 419 P2d 603 (1966). The court did not abuse its discretion in denying the motion. Moreover, ASC, as the assignee for security of the sale contract, was not an indispensable party to plaintiffs' action for damages *for fraud,* ORCP 33, because that was a personal action against defendants which affirmed the validity of the contract. Accordingly, regardless of the merits of the court's ruling granting a setoff to plaintiffs against the contract balance, plaintiffs' judgment cannot determine their rights against ASC's interest. Whether plaintiffs' right to a setoff can affect or prejudice ASC's rights to proceeds of the contract cannot be adjudicated in this litigation to which ASC is not a party.

■     Defendants also assign as error that the court denied their motion to dismiss plaintiffs' claim for a setoff on the ground that plaintiffs had failed to join ASC as a party. For the reasons stated above with respect to ASC's assignment of error, defendants' argument is without merit. As part of defendants' assignment of error, however, they argue that the court should not have allowed the setoff as of August 14, 1981, the date of the contract, because it was the equivalent of an award to plaintiffs of prejudgment interest to which they were not entitled. The jury's verdict already included excess interest that plaintiffs' paid because of the fraud.[6] The judgment

---

[4] Defendants' fifth assignment is without merit. Their counsel stipulated to the admission of the challenged complaint in evidence, and plaintiffs' preliminary questioning was not objectionable on the grounds raised.

[5] Although the court's findings indicate that ASC has a right to intervene, the judgment denies its motion to intervene, and in a separate order filed the same day the court denied the motion. The parties also deemed that the court had denied ASC's motion.

[6] The court instructed the jury:

must be modified to provide that the setoff shall be as of the date of judgment.

Judgment remanded to modify it to provide that the setoff be as of the date of the original judgment and otherwise affirmed; affirmed as to Administration Service Corp.'s appeal.[7]

---

"In addition to any damages calculated by subtracting the fair market value of the property received from the contract price, where the purchaser affirms the contract and elects to retain the property, the purchaser's out-of-pocket damages also include overpaid interest, if any, calculated on the difference between the contract price less the fair market value of the property received. Plaintiffs' total general damages may not exceed the sum of $636,222."

[7] Defendants filed for bankruptcy after plaintiffs filed the action. During oral argument, counsel advised the court that the bankruptcy proceeding had been dismissed.